Justice Scalia
delivered the opinion of the Court.
We decide in this case whether an individual who has obtained a state-law restraining order has a constitutionally *751 protected property interest in having the police enforce the restraining order when they have probable' cause to believe it has been violated.
I-H
The horrible facts of this case are contained in the complaint that respondent Jessica Gonzales filed in Federal District Court. (Because the case comes to us on appeal from a dismissal of the complaint, we assume its allegations are true. See Swierkiewicz v. Sorema N. A., 534 U. S. 506, 508, n. 1 (2002).) Respondent alleges that petitioner, the town of Castle Rock, Colorado, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution when its police officers, acting pursuant to official policy or custom, failed to respond properly to her repeated reports that her estranged husband was violating the terms of a restraining order.[1]
The restraining order had been issued by a state trial eourt several weeks earlier in conjunction with respondent’s divorce proceedings. The original form order, issued on May 21, 1999, and served on respondent’s husband on June 4,1999, commanded him not to “molest or disturb the peace of [respondent] or of any child,” and to remain at least 100 yards from the family home at all times. 366 F. 3d 1093, 1143 (CA10 2004) (en banc) (appendix to dissenting opinion of O’Brien, J.). The bottom of the preprinted form noted that the reverse side contained “IMPORTANT NOTICES FOR RESTRAINED PARTIES AND LAW ENFORCEMENT OFFICIALS.” Ibid, (emphasis deleted). The pre- *752 printed text on the back of the form included the following “WARNING”:
“A KNOWING VIOLATION OF A RESTRAINING ORDER IS A CRIME .... A VIOLATION WILL ALSO CONSTITUTE CONTEMPT OF COURT. YOU MAY BE ARRESTED WITHOUT NOTICE IF A LAW ENFORCEMENT OFFICER HAS PROBABLE CAUSE TO BELIEVE THAT YOU HAVE KNOWINGLY VIOLATED THIS ORDER.” Id., at 1144 (emphasis in original).
The preprinted text on the back of the form also included a “NOTICE TO LAW ENFORCEMENT OFFICIALS,” which read in part:
“YOU SHALL USE EVERY REASONABLE MEANS TO ENFORCE THIS RESTRAINING ORDER. YOU SHALL ARREST, OR, IF AN ARREST WOULD BE IMPRACTICAL UNDER THE CIRCUMSTANCES, SEEK A WARRANT FOR THE ARREST OF THE RESTRAINED PERSON WHEN YOU HAVE INFORMATION AMOUNTING TO PROBABLE CAUSE THAT THE RESTRAINED PERSON HAS VIOLATED OR ATTEMPTED TO VIOLATE ANY PROVISION OF THIS ORDER AND THE RESTRAINED PERSON HAS BEEN PROPERLY SERVED WITH A COPY OF THIS ORDER OR HAS RECEIVED ACTUAL NOTICE OF THE EXISTENCE OF THIS ORDER.” Ibid. (same).
On June 4,1999, the state trial court modified the terms of the restraining order and made it permanent. • The modified order gave respondent’s husband the right to spend time with his three daughters (ages 10, 9, and 7) on alternate weekends, for two weeks during the summer, and, “‘upon reasonable notice,’” for a midweek dinner visit “‘arranged by the parties’ the modified order also allowed him to visit *753 the home to collect the children for such “parenting time.” Id., at 1097 (majority opinion).
According to the complaint, at about 5 or 5:30 p.m. on Tuesday, June 22, 1999, respondent’s husband took the three daughters while they were playing outside the family home. No advance arrangements had been made for him to see the daughters that evening. When respondent noticed the children were missing, she suspected her husband had taken them. At about 7:30 p.m., she called the Castle Rock Police Department, which dispatched two officers. The complaint continues: “When [the officers] arrived..., she showed them a copy of the TRO and requested that it be enforced and the three children be returned to her immediately. [The officers] stated that there was nothing they could do about the TRO and suggested that [respondent] call the Police Department again if the three children did not return home by 10:00 p.m.” App. to Pet. for Cert. 126a.[2]
At approximately 8:30 p.m., respondent talked to her husband on his cellular telephone. He told her “he had the three children [at an] amusement park in Denver.” Ibid. She called the police again and asked them to “have someone check for” her husband or his vehicle at the amusement park and “put out an [all points bulletin]” for her husband, but the officer with whom she spoke “refused to do so,” again telling her to “wait until 10:00 p.m. and see if” her husband returned the girls. Id., at 126a-127a.
At approximately 10:10 p.m., respondent called the police and said her children were still missing, but she was now told to wait until midnight. She called at midnight and told the dispatcher her children were still missing. She went to her husband’s apartment and, finding nobody there, called the police at 12:10 a.m.; she was told to wait for an officer to arrive. When none came, she went to the police station at *754 12:50 a.m. and submitted an incident report. The officer who took the report “made no reasonable effort to enforce the TRO or locate the three children. Instead, he went to dinner.” Id., at 127a.
At approximately 3:20 a.m., respondent’s husband arrived at the police station and opened fire with a semiautomatic handgun he had purchased earlier that evening. Police shot back, killing him. Inside the cab of his pickup truck, they found the bodies of all three daughters, whom he had already murdered. Ibid.
On the basis of the foregoing factual allegations, respondent brought an action under Rev. Stat. § 1979, 42 U. S. C. §1983, claiming that the town violated the Due Process Clause because its police department had “an official policy or custom of failing to respond properly to complaints of restraining order violations” and “tolerate[d] the non-enforcement of restraining orders by its police officers.” App. to Pet. for Cert. 129a.[3] The complaint also alleged that the town’s actions “were taken either willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to” respondent’s civil rights. Ibid.
Before answering the complaint, the defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion, concluding that, whether construed as making a substantive due process or procedural due process claim, respondent’s complaint failed to state a claim upon which relief could be granted.
A panel of the Court of Appeals affirmed the rejection of a substantive due process claim, but found that respondent had alleged a cognizable procedural due process claim. 307 F. 3d 1258 (CA10 2002). On rehearing en banc, a divided *755 court reached the same disposition, concluding that respondent had a “protected property interest in the enforcement of the terms of her restraining order” and that the town had deprived her of due process because “the police never ‘heard’ nor seriously entertained her request to enforce and protect her interests in the restraining order.” 366 F. 3d, at 1101, 1117. We granted certiorari. 543 U. S. 955 (2004).
II
The Fourteenth Amendment to the United States Constitution provides that a State shall not “deprive any person of life, liberty, or property, without due process of law. ” Arndt. 14, § 1. In 42 U. S. C. § 1983, Congress has created a federal cause of action for “the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.” Respondent claims the benefit of this provision on the ground that she had a property interest in police enforcement of the restraining order against her husband; and that the town deprived her of this property without due process by having a policy that tolerated nonenforcement of restraining orders.
As the Court of Appeals recognized, we left a similar question unanswered in DeShaney v. Winnebago County Dept. of Social Servs., 489 U. S. 189 (1989), another case with “undeniably tragic” facts: Local child-protection officials had failed to protect a young boy from beatings by his father that left him severely brain damaged. Id., at 191-193. We held that the so-called “substantive” component of the Due Process Clause does not “requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors.” Id., at 195. We noted, however, that the petitioner had not properly preserved the argument that — and we thus “decline[d] to consider” whether — state “child protection statutes gave [him] an ‘entitlement’ to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection.” Id., at 195, n. 2.
*756 The procedural component of the Due Process Clause does not protect everything that might be described as a “benefit”: “To have a property interest in a benefit, a person clearly must have more than an abstract need or desire” and “more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.” Board of Regents of State Colleges v. Roth, 408 U. S. 564, 577 (1972). Such entitlements are, “‘of course, . . . not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.’” Paul v. Davis, 424 U. S. 693, 709 (1976) (quoting Roth, supra, at 577); see also Phillips v. Washington Legal Foundation, 524 U. S. 156, 164 (1998).
A
Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion. See, e. g., Kentucky Dept. of Corrections v. Thompson, 490 U. S. 454, 462-463 (1989). The Court of Appeals in this case determined that Colorado law created an entitlement to enforcement of the restraining order because the “court-issued restraining order . . . specifically dictated that its terms must be enforced” and a “state statute command[ed]” enforcement of the order when certain objective conditions were met (probable cause to believe that the order had been violated and that the object of the order had received notice of its existence). 366 F. 3d, at 1101, n. 5; see also id., at 1100, n. 4; id., at 1104-1105, and n. 9. Respondent contends that we are obliged “to give deference to the Tenth Circuit’s analysis of Colorado law on” whether she had an entitlement to enforcement of the restraining order. Tr. of Oral Arg. 52.
We will not, of course, defer to the Tenth Circuit on the ultimate issue: whether what Colorado law has given respondent constitutes a property interest for purposes of the Fourteenth Amendment. That determination, despite its *757 state-law underpinnings, is ultimately one of federal constitutional law. “Although the underlying substantive interest is created by ‘an independent source such as state law,’ federal constitutional law determines whether that interest rises to the level of a ‘legitimate claim of entitlement’ protected by the Due Process Clause.” Memphis Light, Gas & Water Div. v. Craft, 436 U. S. 1, 9 (1978) (quoting Roth, supra, at 577; emphasis added); cf. United States ex rel. TVA v. Powelson, 319 U. S. 266, 279 (1943). Resolution of the federal issue begins, however, with a determination of what it is that state law provides. In the context of the present case, the central state-law question is whether Colorado law gave respondent a right to police enforcement of the restraining order. It is on this point that respondent’s call for deference to the Tenth Circuit is relevant.
We have said that a “presumption of deference [is] given the views of a federal court as to the law of a State within its jurisdiction.” Phillips, supra, at 167. That presumption can be overcome, however, see Leavitt v. Jane L., 518 U. S. 137, 145 (1996) (per curiam), and we think deference inappropriate here. The Tenth Circuit’s opinion, which reversed the Colorado District Judge, did not draw upon a deep well of state-specific expertise, but consisted primarily of quoting language from the restraining order, the statutory text, and a state-legislative-hearing transcript. See 366 F. 3d, at 1103-1109. These texts, moreover, say nothing distinctive to Colorado, but use mandatory language that (as we shall discuss) appears in many state and federal statutes. As for case law: The only state-law cases about restraining orders that the Court of Appeals relied upon were decisions of Federal District Courts in Ohio and Pennsylvania and state courts in New Jersey, Oregon, and Tennessee. Id., at 1104-1105, n. 9, 1109.[4] Moreover, if we were simply to ac *758 cept the Court of Appeals’ conclusion, we would necessarily have to decide conclusively a federal constitutional question (i. e., whether such an entitlement constituted property under the Due Process Clause and, if so, whether petitioner’s customs or policies provided too little process to protect it). We proceed, then, to our own analysis of whether Colorado law gave respondent a right to enforcement of the restraining order.[5]
B
The critical language in the restraining order came not from any part of the order itself (which was signed by the state-court trial judge and directed to the restrained party, respondent’s husband), but from the preprinted notice to law-enforcement personnel that appeared on the back of the order. See supra, at 751-752. That notice effectively restated the statutory provision describing “peace officers’ duties” related to the crime of violation of a restraining order. At the time of the conduct at issue in this case, that provision read as follows:
“(a) Whenever a restraining order is issued, the protected person shall be provided with a copy of such *759 order. A peace officer shall use every reasonable means to enforce a restraining order.
“(b) A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person when the peace officer has information amounting to probable cause that:
“(I) The restrained person has violated or attempted to violate any provision of a restraining order; and
“(II) The restrained person has been properly served with a copy of the restraining order or the restrained person has received actual notice of the existence and substance of such order.
“(c) In making the probable cause determination described in paragraph (b) of this subsection (3), a peace officer shall assume that the information received from the registry is accurate. A peace officer shall enforce a valid restraining order whether or not there is a record of the restraining order in the registry.” Colo. Rev. Stat. § 18-6-803.5(3) (Lexis 1999) (emphases added).
The Court of Appeals concluded that this statutory provision — especially taken in conjunction with a statement from its legislative history,[6] and with another statute restricting *760 criminal and civil liability for officers making arrests[7] — established the Colorado Legislature’s clear intent “to alter the fact that the police were not enforcing domestic abuse restraining orders,” and thus its intent “that the recipient of a domestic abuse restraining order have an entitlement to its enforcement.” 366 F. 3d, at 1108. Any other result, it said, “would render domestic abuse restraining orders utterly valueless.” Id., at 1109.
This last statement is sheer hyperbole. Whether or not respondent had a right to enforce the restraining order, it rendered certain otherwise lawful conduct by her husband both criminal and in contempt of court. See § § 18 — 6— 803.5(2)(a), (7). The creation of grounds on which he could be arrested, criminally prosecuted, and held in contempt was hardly “valueless” — even if the prospect of those sanctions ultimately failed to prevent him from committing three murders and a suicide.
We do not believe that these provisions of Colorado law truly made enforcement of restraining orders mandatory. A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes.
“In each and every state there are long-standing statutes that, by their terms, seem to preclude nonenforcement by the police. . . . However, for a number of reasons, including their legislative history, insufficient resources, and sheer physical impossibility, it has been recognized that such statutes cannot be interpreted literally. . . . [T]hey clearly do not mean that a police officer may not lawfully decline to . . . make an arrest. As to third parties in these states, the full-enforcement statutes simply have no effect, and their significance is *761 further diminished.” 1 ABA Standards for Criminal Justice 1-4.5, commentary, pp. 1-124 to 1-125 (2d ed. 1980) (footnotes omitted).
The deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands, is illustrated by Chicago v. Morales, 527 U. S. 41 (1999), which involved an ordinance that said a police officer “ ‘shall order’ ” persons to disperse in certain circumstances, id., at 47, n. 2. This Court rejected out of hand the possibility that “the mandatory language of the ordinance . . . afforded] the police no discretion.” Id., at 62, n. 32. It is, the Court proclaimed, simply “common sense that all police officers must use some discretion in deciding when and where to enforce city ordinances.” Ibid, (emphasis added).
Against that backdrop, a true mandate of police action would require some stronger indication from the Colorado Legislature than “shall use every reasonable means to enforce a restraining order” (or even “shall arrest . . . or . . . seek a warrant”), §§ 18-6-803.5(3)(a), (b). That language is not perceptibly more mandatory than the Colorado statute which has long told municipal chiefs of police that they “shall pursue and arrest any person fleeing from justice in any part of the state” and that they “shall apprehend any person in the act of committing any offense . . . and, forthwith and without any warrant, bring such person before a ... competent authority for examination and trial.” Colo. Rev. Stat. §31-4-112 (Lexis 2004). It is hard to imagine that a Colorado peace officer would not have some discretion to determine that — despite probable cause to believe a restraining order has been violated — the circumstances of the violation or the competing duties of that officer or his agency counsel decisively against enforcement in a particular instance.[8] *762 The practical necessity for discretion is particularly apparent in a case such as this one, where the suspected violator is not actually present and his whereabouts are unknown. Cf. Donaldson v. Seattle, 65 Wash. App. 661, 671-672, 831 P. 2d 1098, 1104 (1992) (“There is a vast difference' between a mandatory duty to arrest [a violator who is on the scene] and a mandatory duty to conduct a follow up investigation [to locate an absent violator].... A mandatory duty to investigate . . . would be completely open-ended as to priority, duration and intensity”).
The dissent correctly points out that, in the specific context of domestic violence, mandatory-arrest statutes have been found in some States to be more mandatory than traditional mandatory-arrest statutes. Post, at 779-784 (opinion of Stevens, J.). The Colorado statute mandating arrest for a domestic-violence offense is different from but related to the one at issue here, and it includes similar though not identical phrasing. See Colo. Rev. Stat. §18-6-803.6(1) (Lexis 1999) (“When a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence . . . has been committed, the officer shall, without undue delay, arrest the person suspected of its commission . . . ”). Even in the domestic-violence context, however, it is unclear how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested. As the dissent explains, post, at 780-781, and n. 8, much of the impetus for mandatory-arrest statutes and policies derived from the idea that it is better for police officers to arrest the aggressor in a domestic-violence incident than to attempt to mediate the dispute or merely to ask the offender to leave the scene. Those other options are only available, of course, when the offender is present at the *763 scene. See Hanna, No Right to Choose: Mandated Victim Participation in Domestic Violence Prosecutions, 109 Harv. L. Rev. 1849, 1860 (1996) (“[T]he clear trend in police practice is to arrest the batterer at the scene ...” (emphasis added)).
As one of the cases cited by the dissent, post, at 783, recognized, “there will be situations when no arrest is possible, such as when the alleged abuser is not in the home.” Donaldson, 65 Wash. App., at 674, 831 P. 2d, at 1105 (emphasis added). That case held that Washington’s mandatory-arrest statute required an arrest only in “cases where the offender is on the scene,” and that it “d[id] not create an on-going mandatory duty to conduct an investigation” to locate the offender. Id., at 675, 831 P. 2d, at 1105. Colorado’s restraining-order statute appears to contemplate a similar distinction, providing that when arrest is “impractical” — which was likely the case when the whereabouts of respondent’s husband were unknown — the officers’ statutory duty is to “seek a warrant” rather than “arrest.” § 18-6-803.5(3)(b).
Respondent does not specify the precise means of enforcement that the Colorado restraining-order statute assertedly mandated — whether her interest lay in having police arrest her husband, having them seek a warrant for his arrest, or having them “use every reasonable means, up to and including arrest, to enforce the order’s terms,” Brief for Respondent 29-30.[9] Such indeterminacy is not the hallmark of a duty that is mandatory. Nor can someone be safely deemed “entitled” to something when the identity of the alleged entitlement is vague. See Roth, 408 U. S., at 577 (considering *764 whether “certain benefits” were “secure[d]” by rule or understandings); cf. Natale v. Ridgefield, 170 F. 3d 258, 263 (CA2 1999) (“There is no reason ... to restrict the ‘uncertainty’ that will preclude existence of a federally protectable property interest to the uncertainty that inheres in [the] exercise of discretion”). The dissent, after suggesting various formulations of the entitlement in question,[10] ultimately contends that the obligations under the statute were quite precise: either make an arrest or (if that is impractical) seek an arrest warrant, post, at 785. The problem with this is that the seeking of an arrest warrant would be an entitlement to nothing but procedure — which we have held inadequate even to support standing, see Lujan v. Defenders of Wildlife, 504 U. S. 555 (1992); much less can it be the basis for a property interest. See post, at 771-772 (Souter, J., concurring). After the warrant is sought, it remains within the discretion of a judge whether to grant it, and after it is granted, it remains within the discretion of the police whether and when to execute it.[11] Respondent would have been assured nothing but the seeking of a warrant. This is not the sort of “entitlement” out of which a property interest is created.
Even if the statute could be said to have made enforcement of restraining orders “mandatory” because of the domestic-violence context of the underlying statute, that would not *765 necessarily mean that state law gave respondent an entitlement to enforcement of the mandate. Making the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people. See, e. g., Sandin v. Conner, 515 U. S. 472, 482 (1995) (finding no constitutionally protected liberty interest in prison regulations phrased in mandatory terms, in part because “[s]uch guidelines are not set forth solely to benefit the prisoner”). The serving of public rather than private ends is the normal course of the criminal law because criminal acts, “besides the injury [they do] to individuals, . . . strike at the very being of society; which cannot possibly subsist, where actions of this sort are suffered to escape with impunity.” 4 W. Blackstone, Commentaries on the Laws of England 5 (1769); see also Huntington v. Attrill, 146 U. S. 657, 668 (1892). This principle underlies, for example, a Colorado district attorney’s discretion to prosecute a domestic assault, even though the victim withdraws her charge. See People v. Cunefare, 102 P. 3d 302, 311-312 (Colo. 2004) (en banc) (Bender, J., concurring in part, dissenting in part, and dissenting in part to the judgment).
Respondent’s alleged interest stems only from a State’s statutory scheme — from a restraining order that was authorized by and tracked precisely the statute on which the Court of Appeals relied. She does not assert that she has any common-law or contractual entitlement to enforcement. If she was given a statutory entitlement, we would expect to see some indication of that in the statute itself. Although Colorado’s statute spoke of “protected person[s]” such as respondent, it did so in connection with matters other than a right to enforcement. It said that a “protected person shall be provided with a copy of [a restraining] order” when it is issued, § 18-6-803.5(3)(a); that a law enforcement agency “shall make all reasonable efforts to contact the protected party upon the arrest of the restrained person,” § 18 — 6— 803.5(3)(d); and that the agency “shalLgive [to the protected *766 person] a copy” of the report it submits to the court that issued the order, § 18-6-803.5(3)(e). Perhaps most importantly, the statute spoke directly to the protected person’s power to “initiate contempt proceedings against the restrained person if the order [was] issued in a civil action or request the prosecuting attorney to initiate contempt proceedings if the order [was] issued in a criminal action.” §18-6-803.5(7). The protected person’s express power to “initiate” civil contempt proceedings contrasts tellingly with the mere ability to “request” initiation of criminal contempt proceedings — and even more dramatically with the complete silence about any power to “request” (much less demand) that an arrest be made.
The creation of a personal entitlement to something as vague and novel as enforcement of restraining orders cannot “simply g[o] without saying.” Post, at 788, n. 16 (Stevens, J., dissenting). We conclude that Colorado has not created such an entitlement.
C
Even if we were to think otherwise concerning the creation of an entitlement by Colorado, it is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a “property” interest for purposes of the Due Process Clause. Such a right would not, of course, resemble any traditional conception of property. Although that alone does not disqualify it from due process protection, as Roth and its progeny show, the right to have a restraining order enforced does not “have some ascertainable monetary value,” as even our “Roth-type property-as-entitlement” cases have implicitly required. Merrill, The Landscape of Constitutional Property, 86 Va. L. Rev. 885, 964 (2000).[12] Perhaps most radically, the alleged property *767 interest here arises incidentally, not out of some new species of government benefit or service, but out of a function that government actors have always performed — to wit, arresting people who they have probable cause to believe have committed a criminal offense.[13]
The indirect nature of a benefit was fatal to the due process claim of the nursing-home residents in O’Bannon v. Town Court Nursing Center, 447 U. S. 773 (1980). We held that, while the withdrawal of “direct benefits” (financial payments under Medicaid for certain medical services) triggered due process protections, id., at 786-787, the same was not true for the “indirect benefits] ” conferred on Medicaid patients when the Government enforced “minimum standards of care” for nursing-home facilities, id., at 787. “[A]n indirect and incidental result of the Government’s enforcement action ... does not amount to a deprivation of any interest in life, liberty, or property.” Ibid. In this ease, as in O’Bannon, “[t]he simple distinction between government action that directly affects a citizen’s legal rights . . . and action that is directed against a third party and affects the citizen only indirectly or incidentally, provides a sufficient answer to” respondent’s reliance on cases that found government-provided *768 services to be entitlements. Id., at 788. The O’Bannon Court expressly noted, ibid., that the distinction between direct and indirect benefits distinguished Memphis Light, Gas & Water Div. v. Craft, 436 U. S. 1 (1978), one of the government-services eases on which the dissent relies, post, at 789.
III
We conclude, therefore, that respondent did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband. It is accordingly unnecessary to address the Court of Appeals’ determination (366 F. 3d, at 1110-1117) that the town’s custom or policy prevented the police from giving her due process when they deprived her of that alleged interest. See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U. S. 40, 61 (1999).[14]
In light of today’s decision and that in DeShaney, the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its “substantive” manifestations. This result reflects our continuing reluctance to treat the Fourteenth Amendment as “‘a font of tort law,’ ” Parratt v. Taylor, 451 U. S. 527, 544 (1981) (quoting Paul v. Davis, 424 U. S., at 701), but it does not mean States are powerless to provide victims with personally enforceable remedies. Although the framers of the Fourteenth Amendment and the Civil Rights Act of 1871, 17 Stat. 13 (the original source of § 1983), did not create a system by which police departments are generally held financially accountable for crimes that better policing might have *769 prevented, the people of Colorado are free to craft such a system under state law. Cf. DeShaney, 489 U. S., at 203.[15]
The judgment of the Court of Appeals is

Reversed.

 Petitioner claims that respondent’s complaint “did not allege . . . that she ever notified the police of her contention that [her husband] was actually in violation of the restraining order.” Brief for Petitioner 7, n. 2. The complaint does allege, however, that respondent “showed [the police] a copy of the [temporary restraining order (TRO)] and requested that it be enforced.” App. to Pet. for Cert. 126a. At this stage in the litigation, we may assume that this reasonably implied the order was being violated. See Steel Co. v. Citizens for Better Environment, 523 U. S. 83, 104 (1998).

 It is unclear from the complaint, but immaterial to our decision, whether respondent showed the police only the original “TRO” or also the permanent, modified restraining order that had superseded it on June 4.

 Three police officers were also named as defendants in the complaint, but the Court of Appeals concluded that they were entitled to qualified immunity, 366 F. 3d 1093, 1118 (CA10 2004) (en banc). Respondent did not file a cross-petition challenging that aspect of the judgment.

 Most of the Colorado-law eases cited by the Court of Appeals appeared in footnotes declaring them to be irrelevant because they involved only substantive due process (366 F. 3d, at 1100-1101, nn. 4-5), only statutes *758 without restraining orders (id., at 1101, n. 5), or Colorado’s Government Immunity Act, which the Court of Appeals concluded applies “only to ... state tort law claims” (id., at 1108-1109, n. 12). Our analysis is likewise unaffected by the Immunity Act or by the way that Colorado has dealt with substantive due process or cases that do not involve restraining orders.

 In something of an anyone-but-us approach, the dissent simultaneously (and thus unpersuasively) contends not only that this Court should certify a question to the Colorado Supreme Court, post, at 776-778 (opinion of Stevens, J.), but also that it should defer to the Tenth Circuit (which itself did not certify any such question), post, at 775-776. No party in this case has requested certification, even as an alternative disposition. See Tr. of Oral Arg. 56 (petitioner’s counsel “disfavor[ing]” certification); id., at 25-26 (counsel for the United States arguing against certification). At oral argument, in fact, respondent’s counsel declined Justice Stevens’ invitation to request it. Id., at 53.

 The Court of Appeals quoted one lawmaker’s description of how the bill “ ‘would really attack the domestic violence problems’ ”:
“ ‘[T]he entire criminal justice system must act in a consistent manner, which does not now occur. The police must make probable cause arrests. The prosecutors must prosecute every case. Judges must apply appropriate sentences, and probation officers must monitor their probationers closely. And the offender needs to be sentenced to offender-specific therapy.
“ ‘[T]he entire system must send the same message . . . [that] violence is criminal. And so we hope that House Bill 1258 starts us down this road.’ ” 366 F. 3d, at 1107 (quoting Tr. of Colorado House Judiciary Hearings on House Bill 1253, Feb. 15, 1994; emphasis deleted).

 Under Colo. Rev. Stat. § 18-6-803.5(5) (Lexis 1999), “[a] peace officer arresting a person for violating a restraining order or otherwise enforcing a restraining order” was not to be held civilly or criminally liable unless he acted “in bad faith and with malice” or violated “rules adopted by the Colorado supreme court.”

 Respondent in fact concedes that an officer may “properly” decide not to enforce a restraining order when the officer deems “a technical violation” too “immaterial” to justify arrest. Respondent explains this as a determination that there is no probable cause. Brief for Respond *762 ent 28. We think, however, that a determination of no probable cause to believe a violation has occurred is quite different from a determination that the violation is too insignificant to pursue.

 Respondent characterizes her entitlement in various ways. See Brief for Respondent 12 (“ ‘entitlement’ to receive protective services”); id., at 13 (“interest in police enforcement action”); id., at 14 (“specific government benefit” consisting of “the government service of enforcing the objective terms of the court order protecting her and her children against her abusive husband”); id., at 32 (“[T]he restraining order here mandated the arrest of Mr. Gonzales under specified circumstances, or at a minimum required the use of reasonable means to enforce the order”).

 See post, at 773 (“entitlement to police protection”); ibid, (“entitlement to mandatory individual protection by the local police force”); post, at 774 (“a right to police assistance”); post, at 779 (“a citizen’s interest in the government’s commitment to provide police enforcement in certain defined circumstances”); post, at 789 (“respondent’s property interest in the enforcement of her restraining order”); post, at 790, 791 (the “service” of “protection from her husband”); post, at 792 (“interest in the enforcement of the restraining order”).

 The dissent asserts that the police would lack discretion in the execution of this warrant, post, at 785, n. 12, but cites no statute mandating immediate execution. The general Colorado statute governing arrest provides that police “may arrest” when they possess a warrant “commanding” arrest. Colo. Rev. Stat. § 16-3-102(1) (Lexis 1999).

 The dissent suggests that the interest in having a restraining order enforced does have an ascertainable monetary value, because one may “contract with a private security firm ... to provide protection” for one’s family. Post, at 773, 790, 791, and n. 19. That is, of course, not as precise *767 as the analogy between public and private schooling that the dissent invokes. Post, at 791, n. 19. Respondent probably could have hired a private firm to guard her house, to prevent her husband from coming onto the property, and perhaps even to search for her husband after she discovered that her children were missing. Her alleged entitlement here, however, does not consist in an abstract right to “protection,” but (according to the dissent) in enforcement of her restraining order through the arrest of her husband, or the seeking of a warrant for his arrest, after she gave the police probable cause to believe the restraining order had been violated. A private person would not have the power to arrest under those circumstances because the crime would not have occurred in his presence. Colo. Rev. Stat. § 16-3-201 (Lexis 1999). And, needless to say, a private person would not have the power to obtain an arrest warrant.

 In other contexts, we have explained that “a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.” Linda R. S. v. Richard D., 410 U. S. 614, 619 (1973).

 Because we simply do not address whether the process would have been adequate if respondent had had a property interest, the dissent is correct to note that we do not “contest” the point, post, at 774. Of course we do not accept it either.

 In Colorado, the general statutory immunity for government employees does not apply when “the act or omission causing... injury was willfirl and wanton.” Colo. Rev. Stat. § 24-10-118(2)(a) (Lexis 1999). Respondent’s complaint does allege that the police officers’ actions “were taken either willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to” her civil rights. App. to Pet. for Cert. 128a.
The state cases cited by the dissent that afford a cause of action for police failure to enforce restraining orders, post, at 782-784, 786, n. 13, vindicate state common-law or statutory tort claims — not procedural due process claims under the Federal Constitution. See Donaldson v. Seattle, 65 Wash. App. 661, 831 P. 2d 1098 (1992) (city could be liable under some circumstances for per se negligence in failing to meet statutory duty to arrest); Matthews v. Pickett County, 996 S. W. 2d 162 (Tenn. 1999) (county could be liable under Tennessee’s Governmental Tort Liability Act where restraining order created a special duty); Campbell v. Campbell, 294 N. J. Super. 18, 682 A. 2d 272 (1996) (rejecting four specific defenses under the New Jersey Tort Claims Act in negligence action against individual officers); Sorichetti v. New York, 65 N. Y. 2d 461, 482 N. E. 2d 70 (1985) (city breached duty of care arising from special relationship between police and victim); Nearing v. Weaver, 295 Ore. 702, 670 P. 2d 137 (1983) (en banc) (statutory duty to individual plaintiffs arising independently of tort-law duty of care).