**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENET CIRCUIT

---

STEPHEN SCHULZ, DARREN
BLOOM, WILLIAM CLARK,
STEVEN DEAL, SEAN HARPER,
TIMOTHY LAMBERT, CRAIG
MORTENSON, SARA PIERCE,
RACHAEL SLOAN, BRIAN SMITH,
MICHAEL STOGSDILL, JENNIFER
ANDERSON, DENISE ARNESON,
KEVIN BLUMENSHINE, TRAVIS
CHAPMAN, CASEY CLOUD,
SHAYNE DOMBROWSKI,
MICHELE GOLDMAN, LUKE
JASSO, TODD LANDIN, MICHAEL
MAJOR, JONATHON MICHAEL,
SCOTT OPIE, ANTHONY PRIOLA,
ARTURO RAMIREZ, TROY REED,
SUSAN HOGG, AMY HENNION,

      Plaintiffs - Appellants,

v.

CITY OF LONGMONT,
COLORADO,

      Defendant - Appellee.

No. 04-1418

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 03-WY-1552-AJ)

---

Darold W. Killmer (Mari Newman, with him on the briefs), Killmer, Lane &
Newman, LLP, Denver, Colorado, for Plaintiffs-Appellants.

Andrew D. Ringel (Thomas J. Lyons, with him on the brief), Hall & Evans, L.L.C., Denver, Colorado, for Defendant-Appellee.

---

Before **BRISCOE**, **McKAY**, and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Due to declining revenues, the City of Longmont, Colorado ("the City") imposed a salary freeze on its employees for the year 2003. Plaintiffs-Appellants ("the Officers"), members of Longmont's fire and police departments, sued the City, alleging that when the City hired them, it had promised each of them annual pay increases for approximately the first three years of their employment. The Officers, who were eligible for such an annual pay increase in 2003, claimed that the City, by imposing the 2003 salary freeze, 1) breached its employment contract with these Officers; 2) in the alternative, was bound by promissory estoppel principles to give the Officers a pay increase for that year; and 3) had deprived the Officers of a property interest without due process. We conclude that, because under Colorado law any promises made to the Officers at the time the City hired them could not bind future City Councils, the district court properly granted the City summary judgment on all of these claims.

I.    **BACKGROUND**

The City pays its police officers and firefighters on a step-pay system.

2

There are four pay steps.[1] The City always hires firefighters at pay step one, while police officers reach step one after completing a probationary period.[2] The City also hires police officers, but not firefighters, as lateral transfers from police departments in other cities and, as such, the City gives those Officers credit for their prior experience with those other cities.

A City ordinance required the City to move an Officer up to the next pay step after the Officer had completed one year at a particular pay step, so long as the Officer had performed satisfactorily.[3] That meant that after approximately three years of satisfactory performance, an Officer would reach the highest pay level, level four. The Officers assert that the City was able to recruit and hire new officers at lower salaries than other comparable cities because the City's

---

[1]After a police officer reaches the fourth pay step, there is a fifth "master police officer" step available. That step, however, is not automatically awarded and is not the subject of this litigation.

[2]A police officer's probationary period lasts between six and twelve months.

[3]Ordinance 3.04.160(C) specifically provided that

[i]f at the time of the employee's annual performance review the executive director or designee determines that the employee is performing at a satisfactory level, the employee shall receive a pay-step increase to the next highest pay step until the maximum step for the salary range is reached. Once the maximum salary pay-step is achieved, each employee shall continue to be reviewed for performance at least every twelve months.

(Emphasis added.)

3

compensation plan allowed the Officers to reach the highest pay level more quickly than officers in other cities.

In 2002, the City was facing a decline in revenues. In light of that, the City manager, along with other City administrators, proposed to the Longmont City Council ("Council") a 2003 budget[4] that froze the wages of all city employees. The proposed budget did include a "one time payment of $500 per regular employee in appreciation of their hard work and dedication to the organization during this difficult financial period."[5] After several weeks of study and public comment and discussion, the City Council approved the proposed budget. In adopting this budget and its wage freeze,[6] the Council also suspended the

---

[4]The 2003 budget was for the City's fiscal year 2003, which ran from January 1 to December 31, 2003.

[5]The City was better able to make a one-time $500 payment to all City employees because such a "one-time" payment could come from a "one-time" funding source, such as a budget surplus. But the City, by its own policy, could only pay salary increases, which would be ongoing once awarded, from ongoing or operating revenues, such as sales tax revenues.

[6]There were exceptions to the wage freeze. For example, the City was required by law to give its apprentice electrical workers an increase:

> Apprentice linemen operate under a written document approved by the state Department of Labor. And if they complete the requirements under whichever level they are in that apprentice program, . . . at that time they would have been eligible for movement, because there was a written approved plan that said that they needed to do that to keep that program eligible under the state Department of Labor.

In addition, the City Council made exceptions from the wage freeze for

(continued...)

4

ordinance requiring the City to give annual step increases.

The City's revenue shortfall for 2003 was not as dire as predicted. As a result, the City Council approved a 2004 budget that included step increases for all Officers eligible for them and reinstated the ordinance requiring the City to give eligible Officers an annual increase.

Twenty-eight Officers who were due to receive step increases in 2003, but who did not receive them because of the wage freeze, filed suit against the City, alleging: 1) breach of contract; 2) promissory estoppel; and 3) deprivation of a property right without due process. The Officers asserted their first two claims under Colorado law and their due process claim under 42 U.S.C. § 1983. The Officers expressly based their claims, not on the City's ordinance requiring the City to pay annual step increases, but only on representations the Officers say the City made when it hired them promising annual pay increases. The district court granted the City summary judgment on all three claims. The Officers now appeal from that decision. Having jurisdiction to consider this appeal under 28 U.S.C. § 1291, we AFFIRM.

## II.    STANDARD OF REVIEW

This court reviews the district court's summary judgment decision de novo,

---

[6](...continued)
"employees coming off probation, employees who were promoted to a higher pay range per the personnel rules, [and] grant-funded positions."

5

viewing the evidence in the light most favorable to the non-moving party.  See

Roberts v. Printup, 422 F.3d 1211, 1214 (10th Cir. 2005).  Summary judgment is

appropriate only "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).

## III.  DISCUSSION

### A.  Claims asserted under Colorado law for breach of contract and promissory estoppel.

The Officers allege that the promises[7] the City made to pay annual step

increases resulted in a contractual obligation or, in the alternative, could be

---

[7]The Officers bore the burden of establishing that the City had promised to pay each of them an annual step increase for approximately the first three years of their employment.  See Elliott v. Colo. Dep't of Corr., 865 P.2d 859, 860-61 (Colo. Ct. App. 1993) (agreeing with plaintiff that she has burden of proving existence of contract); Luttgen v. Fischer, 107 P.3d 1152, 1155 (Colo. Ct. App. 2005) (holding that "a plaintiff must demonstrate justifiable reliance on the acts or statements of another to succeed on claims of promissory estoppel"); Koerpel v. Heckler, 797 F.2d 858, 863, 865 (10th Cir. 1986) (holding plaintiff bears burden of proving he has a property interest protected by due process).  For purposes of this appeal, we will assume that the Officers presented sufficient evidence to meet this burden.  The district court, in granting the City summary judgment, expressed some skepticism as to whether the Officers had actually met their burden of asserting evidence that the City made such promises to each of the Officers.  We share that skepticism.  Nevertheless, as explained more fully below, even assuming the Officers were able to establish that the City made such promises, Colorado law would in any event preclude the Officers' reliance on those promises.  Therefore, we turn directly to that issue.

6

enforced against the City under a theory of promissory estoppel.[8]  Under Colorado

law, however, a municipality's authority to enter into contractual obligations is

circumscribed by statute and ordinance.  See Colo. Springs Fire Fighters Ass'n v.

City of Colo. Springs, 784 P.2d 766, 773-74 (Colo. 1989); see also Shaw v.

Sargent Sch. Dist. No. RE-33-J ex rel. Bd. of Educ., 21 P.3d 446, 449-50 (Colo.

Ct. App. 2001).  These restrictions are incorporated into any contract the

municipality makes.  See Keeling v. City of Grand Junction, 689 P.2d 679, 680

(Colo. Ct. App. 1984); see also Colo. Invs. Servs., Inc. v. City of Westminster,

---

[8]Colorado law recognizes both "express contract[s] . . . evidenced by the
parties' written or oral words," as well as contracts implied in fact, which are
"based on the conduct of the parties to the agreement."  Agritrack, Inc. v. DeJohn
Housemoving, Inc., 25 P.3d 1187, 1192 (Colo. 2001) (quotation omitted).  "In
both cases, a contract is created by the meeting of the minds to contract with each
other," and "[t]here is no difference in legal effect between express and implied
in fact contracts."  Id. (quotation omitted).  In either case, it is the Officers'
burden to prove the existence of a contract.  See Elliott, 865 P.2d at 860-61.

Alternatively, if the Officers are unable to establish the existence of a
contract, they might still recover under a theory of promissory estoppel.
"Promissory estoppel is an extension of the basic contract principle that one who
makes promises must be required to keep them."  Patzer v. City of Loveland, 80
P.3d 908, 912 (Colo. Ct. App. 2003).

> The elements of promissory estoppel are: (1) the promisor made a
> promise to the promisee; (2) the promisor should reasonably have
> expected that the promise would induce action or forbearance by the
> promisee; (3) the promisee in fact reasonably relied on the promise to
> the promisee's detriment; and (4) the promise must be enforced to
> prevent injustice.

Id.  To recover under a theory of promissory estoppel, then, the Officers "must
demonstrate [their] justifiable reliance on the acts or statements" made by the
City.  Luttgen, 107 P.3d at 1155.

7

636 P.2d 1316, 1318 (Colo. Ct. App. 1981). And anyone that contracts with a municipality is charged with constructive knowledge of those restrictions and, therefore, cannot claim any justifiable reliance on representations made beyond the municipality's contractual authority. Colo. Springs Fire Fighters Ass'n, 784 P.2d at 774 (holding that "[p]ersons dealing with the City are on constructive notice of the scope of authority possessed by the municipal officials with whom they are dealing;" further holding that "[t]his constructive notice includes the knowledge that the city council acted pursuant to the authority granted it by the city charter and subject to the limitations provided therein"); Keeling, 689 P.2d at 680 (holding that "[o]ne who contracts with a municipality is charged with knowledge of its limitations and restrictions in making contracts"); Colo. Invs. Servs., Inc., 636 P.2d at 1318 (same).[9]

_____

[9]The Officers rely upon Normandy Estates Metropolitan Recreation District v. Normandy Estates, Ltd., 553 P.2d 386 (Colo. 1976), and several other cases, to argue that "Colorado courts have long held that a city may not hide behind a claim of *ultra vires* contract to avoid its duty to justly compensate for benefits received under an agreement." These cases on which the Officers rely, however, are distinguishable from the situation in this appeal.

In Normandy Estates, the Colorado Supreme Court was concerned with the inequities that may occur when a private party has already conferred a benefit on a government entity pursuant to a contract that turns out to have been created contrary to that entity's authority. See 553 P.2d at 389. The Colorado Supreme Court determined that, in such a case, to permit the government entity to avoid its obligations under an unenforceable contract would permit an "unduly harsh and inequitable" result. Id. Therefore, in Normandy Estates, the Colorado Supreme Court "adopt[ed] what appears to be the prevailing rule: that where property is furnished to a municipal corporation under an unenforceable contract, and the

(continued...)

8

Applying these principles, Colorado courts have specifically determined that municipalities retain the ability to change the compensation and benefits they provide to their employees. For example, in Keeling, 689 P.2d 679, the Colorado Court of Appeals addressed the manner in which the City of Grand Junction compensated its police officers and firefighters. See id. at 680. Grand Junction had "initiated an educational incentive pay program," which increased an officer's base pay "when a participant earned a specified number of college credits and accumulated a specified number of years of law enforcement [or fire fighting] experience." Id. Grand Junction decided to terminate that program and instead "equalize[] the salaries of all police officers and fire[fighters] having similar rank and time in grade within each department without regard to individual educational

---

[9](...continued)
municipality has not paid for the property, then the seller or person supplying the property may, upon equitable terms, recover it In specie." Id.

The other cases relied upon by the Officers, Mountjoy & Frewen v. Cheyenne County High School District, 240 P. 464, 464-65 (Colo. 1925), and City of Colorado Springs v. Colorado City, 94 P. 316, 316, 320 (Colo. 1908), can similarly be distinguished because in each case the city had already received and retained the benefits provided by the contracts and only afterwards sought to avoid paying for those benefits. Further, those cases, decided more than seventy-five years ago, must be read in light of Colorado's modern authority discussed above in the text.

Here the Officers sought to enforce what was then a future right to a step increase, rather than payment for a benefit already conferred on the City. The City approved the 2003 budget, with its wage freeze, in 2002; therefore, the Officers knew before they worked in 2003 that they were not going to receive any step increase that year.

9

levels." Id. Several police officers and firefighters challenged the change in the manner in which they were to be compensated, suing Grand Junction for breach of contract and, in the alternative, recovery under promissory estoppel principles. See id.

The Colorado Court of Appeals in Keeling noted that, like Longmont's City Council, the Grand Junction City Council was "vested with all the legislative power of the City." Id. The court held that

> [a] city council, in the exercise of its legislative power, cannot enter into a contract which will bind succeeding city councils and thereby deprive them of the unrestricted exercise of their legislative power. Among the legislative powers of a city council is the fixing of salaries of city employees. Therefore, the Grand Junction City Council, being vested with all the legislative power of the City, had the power to adopt a new pay plan setting forth rates of pay for all city employees and terminating the prior program.

Id. (citations omitted). The Colorado Court of Appeals, therefore, rejected the arguments of the officers and firefighters in Keeling that they were entitled to recover for breach of contract or, in the alternative, under a theory of promissory estoppel:

> One who contracts with a municipality is charged with knowledge of its limitations and restrictions in making contracts. The existing law at the time and place of the making of the contract, including the city charter, becomes a part of the contract.
>
> Charged with knowledge that succeeding city councils are not bound by the legislative acts of their predecessors in setting salaries for city employees, plaintiffs cannot prevail on the basis of contract. Because the fixing of salaries is subject to change and the receipt of a salary is contingent upon continued employment with the City,

10

> plaintiffs do not have a vested contractual right in the continuance of a particular rate or method of compensation.
>
> For the same reasons, plaintiffs could not have reasonably relied upon continuing payments under the program, and therefore, their claims based on promissory estoppel must fail.

Id. at 680-81 (citations omitted).

The Colorado Supreme Court later relied on Keeling to address the manner in which the City of Colorado Springs provided medical benefits to retired city employees in Colorado Springs Fire Fighters Association, 784 P.2d at 773. Similar to the step increases at issue in this case, the Colorado Supreme Court noted that Colorado Springs' healthcare benefits was one of the features of the City's benefit package that enabled the City both to hire and retain qualified individuals. Id. Establishing and modifying "such an employee benefit has traditionally been within the scope of legislative discretion." Id. In that case, the Colorado Supreme Court held that a 1966 ordinance providing that Colorado Springs would pay the health insurance premiums for its retired employees did not preclude the City from later passing another ordinance that instead limited the City's contribution toward its retired employees' health insurance. Id. at 768-69, 773-74. In reaching that conclusion, the Colorado Court relied on the fact that the Colorado Springs City Council, in passing the 1966 ordinance, did not intend to create a binding contractual right;[10] the City Charter provided that neither the

---

[10]Colorado law does recognize that "[a] statute or ordinance [can] be
(continued...)

11

City Council nor any city employee could incur any liability on the City's behalf "unless and until a definite amount of money shall have been appropriated;" and concluded that interpreting the 1966 ordinance to bind Colorado Springs in the future "would impose future liability upon the City by requiring subsequent councils to annually appropriate the funds needed to fund the health premium obligations. This interpretation is erroneous because it is inconsistent with the limitations imposed by the city charter." Id. at 773 (quotation omitted).

Applying Keeling and Colorado Springs Fire Fighters Association to this case, we conclude that the Officers did not have any legally cognizable expectation of receiving annual step increases for approximately the first three years of their employment. As a starting point, it is clear that the City's Council had the authority to repeal the ordinance requiring it to pay annual step increases and to pass a budget, by ordinance, that did not provide for any employee increases. As a home rule municipality, Longmont's Council was vested with "plenary legislative authority over matters exclusively local in nature." Colo.

_____

[10](...continued)
considered a contract, [but] only when its language and the surrounding circumstances manifest a legislative intent to create private contractual rights enforceable against the state or municipality." Colo. Springs Fire Fighters Ass'n, 784 P.2d at 773. There is a presumption, however, "that a law is not intended to create private contractual vested rights, but merely declares a policy to be pursued until the legislature shall ordain otherwise." Id. (quotation omitted); see also Alderton v. State, 17 P.3d 817, 819 (Colo. Ct. App. 2000). As mentioned previously, however, the Officers expressly do not rely on any ordinance as the basis for their claims that they have a contractual right to receive annual step increases.

12

Springs Fire Fighters Ass'n, 784 P.2d at 773 n.18 (citing Colo. Const. art. XX). This would include determining the salaries the City paid its employees. See id. (considering benefits city paid its retired employees to be local in nature); see also Keeling, 689 P.2d at 680 (noting that "the fixing of salaries of city employees" is "[a]mong the legislative powers of a city council"). Further, the City Charter required the Council to consider and adopt by ordinance an annual budget. And such a budget would contain a plan to pay salaries. Under Keeling and its progeny, the Council was not bound by the previous ordinance requiring the City to pay annual step increases, nor by the City's prior conduct in paying those increases.

The Officers do not challenge this. They assert instead that the City employees who promised the Officers annual step increases nevertheless bound the City to pay those increases. But Keeling and related cases clearly preclude such an argument. Pursuant to the City's Charter, only the Council could create monetary obligations. Therefore, City employees could not otherwise bind the City contractually to an agreement that the Council did not validly create. See Seeley v. Bd. of County Comm'rs, 791 P.2d 696, 700 (Colo. 1990) (holding government employee cannot enforce terms of contract his government supervisor was not authorized to create); cf. Cherry Creek Aviation, Inc. v. City of Steamboat Springs, 958 P.2d 515, 519-20 (Colo. Ct. App. 1998) (holding that, because "[c]ontracts executed by municipal corporations are void when there is a

13

failure to comply with the mandatory provisions of the applicable statutes or charters," City was not bound by contract improperly entered into by City's airport authority).

And, as discussed above, the Officers are deemed to have knowledge of the limitations on the City's ability to contract. See Colo. Springs Fire Fighters Ass'n, 784 P.2d at 774; Keeling, 689 P.2d at 680. For that reason, they cannot assert that they reasonably relied on any promises made by City employees for purposes of promissory estoppel. See Keeling, 689 P.2d at 681; see also Seeley, 791 P.2d at 701 (holding government employee cannot recover on theory of estoppel based on his supervisor's assertions when supervisor was not authorized to take that action or make that promise).

The Officers seek to avoid this result, compelled by Colo. Springs Fire Fighters Association and Keeling, by arguing that it was not the legislative action of the City Council that deprived them of their step increases, but it was instead the decisions made by City administrators, in administering the Council's 2003 budget, that deprived the Officers of their step increases. Said another way, the Officers argue that, even though the City Council repealed the ordinance requiring the City to pay the Officers' annual step increases during their first three years of employment, City administrators remained free to pay these

14

increases from money that was included in the City's budget.[11]  That argument, however, is unavailing for several reasons.

As an initial matter, undisputed evidence in the record clearly indicates that the City Council, in approving the 2003 budget, affirmatively decided to freeze City employees' wages and, as part of that freeze, decided not to pay the Officers

---

[11]It would have taken an additional $75,000 to pay all the step increases due the Officers in 2003.  There was money in the budget from which the City could have paid this amount.  City administrators had built into the proposed budget enough money from which the City could have paid every officer in the City at the highest pay level, step four.  Those preparing the 2003 budget proposal included this extra money because the City had run into trouble in 2002 when, while adopting a new compensation system, the City "had some budgeting failures where we did not have proper amounts budgeted to be able to recover all positions by trying to budget at the actual step" on which an employee was to be paid.  In light of those problems, "we determined that the safest bet for 2003 in trying to project salaries would be to use the top step, as opposed to the actual step, or the projected step, so that we would not underbudget any of those positions."  This had been a common budgeting strategy in the 1990s.  In May 2003, the Council eventually passed an ordinance removing this excess money from the City's General Fund.

In addition to the fact that there was extra money already built into the approved 2003 budget, the projected revenue shortfall on which the 2003 budget was based turned out to be overly pessimistic.  In fact, the City took in $1.25 million more in revenues in 2002 than it had anticipated.  And the City had a $2-3 million carryover from 2003 to 2004.  In addition, the City had $13 million in its General Fund at the end of 2002, and still more at the end of 2003, while it was only required by City policy and state statute to retain several million dollars in its General Fund for emergency purposes.  While the Officers assert that the City could have paid their step increases from these surplus funds, however, undisputed evidence in the record indicates that City policy precluded using these one-time surplus funds to pay ongoing salary increases.

15

any step increases for that year.[12]  It is also clear that City administrators did not have the authority to act contrary to the Council's budget, adopted by ordinance, and pay the Officers their step increases without Council approval.

Moreover, even if City officials <u>could</u> have paid the Officers their 2003 step increases without Council approval, this does not establish that the Officers

_____

[12]Undisputed evidence in the record indicates that the City manager specifically addressed the wage freeze in his letter presenting the proposed budget to the Council on August 28, 2002:

> [T]he budget does not include resources to adjust employee pay.  This is the first time in sixteen years that we have been in this situation.  The only way that resources could have been made available for salary increases in 2003 would be to dramatically reduce ongoing service levels to offset the level of ongoing expenses that would go toward salaries.

The proposed wage freeze, and in particular the decision not to pay any step increases, was the subject of specific comments made to the Council during several public meetings by City employees, and council members.  And the ordinance by which the Council eventually adopted the 2003 budget specifically suspended the previous City ordinance that had required the City to pay step increases annually.  This undisputed evidence clearly indicates that the Council specifically considered and affirmatively decided not to raise City employees' salaries in 2003, and that included not paying the Officers any step increases.

Further, although the proposed budget the Council approved actually contained enough money to pay the Officers' step increases, <u>see</u> <u>infra</u> note 11, undisputed evidence in the record indicates that the Council did not specifically know that.  The evidence in the record indicates that the Council only approved a lump sum for police and fire fighters' salaries, and was not aware of individual officers' salaries.  Moreover, regardless of the existence of that additional money in the budget, the Council clearly chose not to pay the Officers those step increases.  Underlying this policy decision was the Council's belief that, because the City did not have enough money to give <u>all</u> City employees a wage increase, the City should not give <u>any</u> employees an increase.  And it would have taken $1-1.5 million to fund the increases that all City employees anticipated in 2003.

had a legally cognizable right to receive those increases.  Based upon our

previous discussion, the Officers still would not have been justified in relying on

the previous representations of City employees that the City would pay the

Officers an annual step increase for the first three years of their employment.

For these reasons, we conclude the district court properly granted the City

summary judgment on the Officers' contract and promissory estoppel claims

asserted under Colorado law.[13]

**B.      Claims asserted under 42 U.S.C. § 1983[14] alleging the City deprived the Officers of a property right without due process.**

The Officers also allege that the City deprived them of a property interest

in their annual step increase without providing them due process.  "[T]he Due

Process Clause provides that certain substantive rights–life, liberty, and

property–cannot be deprived except pursuant to constitutionally adequate

procedures."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985).

---

[13]In light of this conclusion, we need not address the City's alternative argument – that any promises that the City made to pay the Officers an annual pay-step increase violates the Colorado Constitution, as amended by the Taxpayer Bill of Rights.

[14]Section 1983 provides, in pertinent part, that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

17

"An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Id. at 542 (quotation omitted). "To determine whether a plaintiff was denied procedural due process, we engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" Copelin-Brown v. N. M. State Personnel Office, 399 F.3d 1248, 1254 (10th Cir. 2005) (quotation omitted). We conclude that the Officers have failed to make a showing of a protectable interest cognizable under the Due Process Clause. Accordingly, we affirm summary judgment for the City on this claim, without needing to address the second issue of the level of process provided by the City.

> The procedural component of the Due Process Clause does not protect everything that might be described as a "benefit": To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. Such entitlements are of course[] not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.

Town of Castle Rock v. Gonzales, 545 U.S.748, 125 S. Ct. 2796, 2803 (2005) (citations, quotations, alteration omitted). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Id. The determination of whether an individual has a protected property interest under state law is ultimately a matter of federal constitutional law. See id.

18

"State law sources for property interests can include statutes, municipal charters or ordinances, and express or implied contracts." Kinsgford v. Salt Lake City Sch. Dist., 247 F.3d 1123, 1128 (10th Cir. 2001); see also Hulen v. Yates, 322 F.3d 1229, 1240 (10th Cir. 2003) (per curiam). In this case, the property interest the Officers assert they had in receiving their 2003 step increases is the same purported contractual right to an annual step increase that underlies their state-law claims for breach of contract and promissory estoppel. That claim of a property right protected by due process fails for the same reasons that the Officers' claims alleging breach of contract and promissory estoppel fail. The district court, therefore, did not err in granting the City summary judgment on this due process claim.

IV. **CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's decision granting the City summary judgment on all claims.