NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0271n.06

No. 13-3720

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 11, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SHARON PIERCE, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF OHIO |
| SPRINGFIELD TOWNSHIP, OHIO, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: MERRITT, BOGGS, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge. Cordell Drummond shot himself in the leg and lay bleeding off a public street. Two Springfield Township police officers called paramedics and then stood by with guns drawn, reasonably believing that Drummond may have been armed and dangerous. Sharon Pierce, individually and as administratrix of Drummond's estate, sued the Township under 42 U.S.C. § 1983, alleging that the Township's police officers violated Drummond's due-process rights by failing to provide medical aid and by preventing civilian bystanders from providing aid. The district court granted summary judgment for the Township. Because the Township did not deprive Drummond of a constitutional right, we affirm.

I

A

In the late evening of December 5, 2010, and early morning of December 6, Cordell Drummond fired several handgun rounds into the ground. Officers Marc Downs and Joseph

1

Powers were parked in their patrol cars chatting with the windows down at the car wash at Seven Hills Plaza. At around 1:12 a.m., both officers responded to calls from the neighbors about the gunshots and drove—only 400 yards away—to the 10900 block of Birchridge Drive to investigate. At around 1:15 a.m., the officers arrived at the scene.

Powers and Downs saw Drummond in front of 10929 Birchridge Drive. Downs got out of his car and approached Drummond to inquire about the reported gunshots. Downs made eye contact with Drummond, but Drummond ran from Downs before Downs could ask any questions. Downs immediately saw Drummond put his hands in his front waistband. After Drummond took about four steps, Downs heard a gunshot. He saw Drummond stop momentarily, jump several times, and then continue running. Downs saw that Drummond held a black 9-mm Glock in his right hand. Downs pursued Drummond and yelled to Powers, "Joe, he's got a gun. He's got a gun." Drummond collapsed in the snow in the front yard of 10904 Birchridge Drive, where his grandmother Gail Lewis lived in an apartment building.

The officers approached Drummond with guns drawn and pointed, unsure of whether Drummond was still armed. Powers heard Drummond yell "I'm going to die!" The officers observed that Drummond was conscious but bleeding; they also observed that for the entire five minutes until the EMT squad arrived, Drummond was holding his right upper thigh with both hands. They radioed to Sergeant Burton Roberts that Drummond had a self-inflicted gunshot wound to his abdomen area. At 1:16 a.m., an EMT squad was dispatched. By 1:17 a.m., it was en route to the scene. At 1:22 a.m., an ambulance arrived. By 1:27 a.m., the EMT squad was transporting Drummond to the University of Cincinnati Medical Center. Tragically, Drummond died from his wound at the hospital.

2

In the five minutes intervening, Powers and Downs did not touch Drummond, handcuff him, or restrain him in any way. They observed that Drummond was bleeding and had blood on his hands and pants, but they could not observe the severity of Drummond's injury or the extent of his blood loss. Downs told Drummond: "No, you're not [going to die]. Just hang on a minute. Life squad is on the way." Powers's main concern was to keep Drummond talking and to try to keep Drummond calm while the EMT squad was en route. Powers told Drummond: "You're not going to die. You're okay. The squad is on the way. The EMS is en route. They'll be here shortly."

Powers asked Drummond if he was still armed, and Drummond said he was not. Powers felt he could not believe Drummond until Drummond's weapon was found. Downs, similarly, considered Drummond a threat until the gun was found. Powers's objective was to make the scene safe and secure.

After the officers radioed dispatch, Jason Drummond, Cordell's uncle and a resident of Birchridge Drive, approached the scene. Jason Drummond did not speak, and the officers did not know his identity, intentions, or whether he was armed. Downs held Jason Drummond at gunpoint momentarily and ordered him not to walk closer. Sergeant Roberts arrived at the scene, and Roberts handcuffed Jason Drummond and placed him in a police cruiser. At this point, Downs still did not know if Drummond was armed or where his gun was located. Downs instructed Powers to stay with Drummond with his gun drawn. During this time, Downs could hear two women yelling out the window from a nearby residence.

Powers kept his gun trained on Drummond while Downs left to retrace Drummond's path in search of the weapon. Powers consoled Drummond, reassuring him that paramedics were coming and that he would not die. Downs located the gun in a nearby yard.

3

Gail Lewis, Cordell's grandmother and another resident of Birchridge Drive, also approached the scene. Lewis was visibly upset and asked what happened. Powers did not know who Lewis was, but he responded that an individual had shot himself in the leg and ordered Lewis to stay back because he did not know if Drummond was still armed.

Also present at the scene was Eva Hunter, Drummond's girlfriend and another resident of Birchridge Drive. Hunter stood in her yard and observed the scene by "look[ing] down the street." From where Hunter was standing three to four houses away, she observed Drummond lying on the ground and holding his right upper thigh and saw the officers standing over Drummond. Hunter stated that she could not hear anything Drummond said and that she could "just barely see his lip movement."

Hunter stated in deposition that she heard the officers ordering Drummond to "get down," "lay [sic] back down," and "stay still." Hunter also stated that, prior to the EMT squad arriving, there were other officers at the crime scene in addition to Powers and Downs. Specifically, Hunter said that eight to twelve officers were at the scene. Hunter also stated that she saw officers in S.W.A.T. gear. Hunter said in her deposition that she observed one S.W.A.T. officer wearing a "big vest" and "Army boots"—"[n]ot the normal boots that police officers wear." Hunter also stated that she saw officers with rifles. Hunter also stated in her deposition that she did not see the EMT squad arrive, has no personal knowledge of how long it took the EMT squad to arrive, but that Drummond was on the ground for thirty to forty-five minutes before the squad arrived. Hunter observed Drummond trying to grab his leg, but she felt that compliance with officers' orders prevented him from "position[ing] hisself [sic] to where he needed to get to." Hunter stated that while she was outside, she remained in her yard and did not approach

4

Birchridge Drive. Hunter returned inside her home before the EMT squad arrived. She stated that she was outside observing the scene for "no more than two or three minutes."

Jason Drummond and Gail Lewis stated that they attempted to approach Drummond. Jason Drummond said in his deposition that he had taken CPR classes at work. Lewis said in her deposition that she had taken a few first aid classes in high school and at a local hospital in 1991. Lewis said in her deposition that she would have tried to stop Drummond's bleeding by applying pressure to his wound with a head scarf. Neither Lewis nor Jason Drummond informed the officers of any qualifications or desire to render first aid. Jason Drummond stated that Cordell became weaker over time because of his blood loss and that his ability to hold his leg diminished.

The paramedic stated that Drummond was unconscious when the ambulance arrived at the scene. It took about twenty minutes to transport Drummond from the scene to the hospital. Plaintiffs' medical expert, Dr. Victor Garcia, felt that controlling external bleeding either with direct pressure or the application of a proximal tourniquet to Drummond's wound would have increased his "chance of survival by more than 50%."[1]

B

On February 20, 2012, Drummond's relatives filed an amended complaint against the police officers and the Township, asserting various federal and state claims. Sharon Pierce, Drummond's mother, sued individually and as administratrix of Drummond's estate. Lewis and Jason Drummond sued individually. Pierce's federal claim, arising under § 1983, alleged that the officers violated Drummond's Fourteenth Amendment due-process rights by: 1) not giving

---

[1] Dr. Garcia's report is unclear about whether he meant that taking the described steps would increase Drummond's chance of survival by more than fifty percent—that is, that Drummond's chance of survival would increase, for example, from 10% to 20%--or whether he meant that taking the described steps would result in a chance of survival over 50%.

5

first aid to Drummond; 2) preventing Drummond from treating his own wounds; and 3) preventing Jason Drummond and Lewis from carrying out a private rescue. The district court granted the Township's motion for summary judgment. We review de novo the district court's grant of summary judgment. *Toner v. Vill. of Elkton*, No. 12-2601, 2013 WL 6183005, at \*3 (6th Cir. Nov. 26, 2013).

II

Section 1983 provides a federal cause of action against state officials for the deprivation of constitutional rights under color of state law. § 1983. Here, Pierce asserts that the police officers deprived Drummond of his Fourteenth Amendment due-process right in three ways. First, Pierce argues that the officers neglected to provide medical aid to Drummond. Second, Pierce alleges that the officers exposed Drummond to a state-created danger by preventing him from tending to his own wound. Third, Pierce alleges that the officers are liable for preventing a private rescue.

"No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Pierce claims the benefit of this provision on the ground that Drummond had a liberty interest in receiving medical care while he was allegedly in custody. Pierce's claim "is one invoking the substantive rather than the procedural component of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

Both parties recognize the centrality of the Supreme Court's seminal decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), a case, like this one, with "undeniably tragic" facts. *Id.* at 191. *DeShaney* stands for the principle that there is no general duty on the part of the state to protect its citizens from private harms. Strict

negative rights are a distinctive aspect of the American constitutional system. "The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (Posner, J.).

In *DeShaney*, local child-protection officials failed to protect a young boy from beatings by his father that left him severely brain damaged. *DeShaney*, 489 U.S. at 191–93. The boy and his mother sued under § 1983, alleging that state officials deprived the boy of his liberty without due process of law by failing to intervene to protect him. *Id.* at 193. The Supreme Court held that the substantive component of the Due Process Clause does not "require[] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id*. at 195. The Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* We decide this case against the backdrop of *DeShaney*.[2]

---

[2] The Supreme Court further extended the *DeShaney* doctrine in *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), a case with truly "horrible facts." *Id.* at 751. There, a mother obtained a restraining order limiting contact between her estranged husband and their three daughters. *Id.* at 751–55. The restraining order, in all-uppercase text, contained a "notice to law enforcement officials" that required them to enforce the order. *Id.* at 752. Further, Colorado law mandated enforcement of restraining orders when probable cause existed to believe the order had been violated. *Id.* at 756.

One evening, the mother noticed that her children were missing and suspected that her husband had taken them. *Id.* at 753. The mother called the police, but the police refused to enforce the restraining order. *Id.* The mother then called her husband who said he was at an amusement park with the three daughters. *Id.* Again the mother called the police, and again the police refused to enforce the restraining order. *Id.* When her husband did not return the children, the mother called the police two more times, and the police did nothing. *Id.* When the husband did not return the children by midnight, the mother went in person to the police station to seek enforcement of the restraining order, but the police did nothing. *Id.* at 753–54. That evening, the husband murdered the three girls. *Id.* at 754. The police found their three bodies inside the cab of the husband's pickup truck. *Id.*

A

Pierce's first theory of liability is that the Township assumed a special responsibility to assist Drummond because they placed him in custody. It is true that the *DeShaney* doctrine contains what has been called a "custody exception" in which "the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . trigger[s] the protections of the Due Process Clause." *Id.* at 200. Different standards apply to determining whether an individual is in "custody" for Fourth Amendment purposes and for purposes of the Fourteenth Amendment and *DeShaney*'s custody exception. For Fourth Amendment purposes, individuals are in custody when a police officer restrains their liberty in such a way that reasonable persons would believe that they were not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002). For purposes, however, of the Fourteenth Amendment and of *DeShaney*'s custody exception, custody requires that the state restrain an individual "through incarceration, institutionalization, or other similar restraint." *DeShaney*, 498 U.S. at 200. *DeShaney*'s custody exception requires, "at a minimum—actual, physical restraint of the suspect by the police." *Cutlip v. City of Toledo*, 488 F. App'x 107, 114 (6th Cir. 2012). *DeShaney*'s custody standard is a "difficult and more exacting standard than for a Fourth Amendment seizure." *Id.* The essential point is that, although both standards involve determining whether an individual is in "custody," they are "legally different concepts." *Id.*

---

The mother brought suit under § 1983, alleging that the police acted recklessly and with wanton disregard to her civil rights. *Id.* The Supreme Court held that the Due Process Clause does not confer a right to have the State enforce a restraining order. *Id.* at 767–68.

In this case, even viewing the facts in Pierce's favor, Drummond was not in custody for *DeShaney* purposes.[3] He was not incarcerated, institutionalized, or subjected to "other similar restraint." *Id*. Nor was he handcuffed, arrested, restrained, or even touched by the police. Drummond was incapacitated by a self-inflicted gunshot wound, and he collapsed to the ground before the officers reached him. Under these circumstances, Drummond was not in custody for *DeShaney* purposes.

Pierce argues that whether Drummond was in custody was a question of material fact for the jury to decide. Pierce maintains that the officers covered Drummond with their weapons and ordered him to stay still. But the mere exercise of "control over an environment is alone insufficient" to bring an individual within *DeShaney*'s custody exception. *Carver v. City of Cincinnati*, 474 F.3d 283, 286 (6th Cir. 2007). We agree with the district court's thorough analysis—that the officers' actions in securing a potential crime scene did not constitute custody under the *DeShaney* doctrine. *See Pierce v. Springfield Township*, No. 1:11-cv-847, slip op. at 10–14 (S.D. Ohio May 21, 2013). No set of facts consistent with the allegations supports a finding that the officers took Drummond into *DeShaney* custody.[4]

We also question whether the officers even had the medical training to allow them to treat a gunshot wound. Downs stated that he received training in "basic first aid, CPR" at the police academy but that he has never received any other first-aid training. Downs stated that he would not feel comfortable treating an injury like Drummond's because he "did not know the

---

[3] We do not and need not determine whether the circumstances constituted custody for Fourth Amendment purposes. Even if Drummond were in custody under the conventional Fourth Amendment standard, he was not in custody within the limited meaning of *DeShaney*.

[4] Though it is not necessary to reach the question, we also agree with the district court's thorough analysis that even if Drummond were in *DeShaney* custody, the officers did not act in a manner that was deliberately indifferent to Drummond's condition. *See Pierce*, No. 1:11-cv-847, slip op. at 14–21.

9

extent of his injuries." The Township has not informed Downs that he erred in judgment by not attempting to aid Drummond. Powers has received basic first-aid training but has never received training in how to treat a bleeding victim. Powers's knowledge about how to respond to an open wound rested only on "common knowledge" and was the same as that of a reasonable person. Powers stated that his main concern as Drummond bled was "keeping [Drummond] talking, trying to calm him down and wait[ing] for the EMS to get there." Under these circumstances, any failure to treat would be, at most, negligent and thus not actionable under § 1983.

B

Pierce's second theory of liability is that the officers exposed Drummond to danger by preventing him from applying pressure to his wound. The first problem with this argument is that the facts, viewed most favorably to Pierce, provide no support for it. Every eyewitness—Downs, Powers, Jason Drummond, Lewis, and Hunter—stated that Drummond had his hands on his legs while the ambulance was en route to the scene. Hunter's statements suggest that the officers' instructions may have momentarily inhibited Drummond from applying pressure to his wound, but Hunter expressly stated that Drummond had his hands on his wound the entire time she watched him.[5]

The second problem with the argument is that it fails to state a legal claim. The officers' act of standing by Drummond with guns drawn "played no part in [the] creation [of the danger], nor did it do anything to render [Drummond] any more vulnerable to [that danger]." *DeShaney*,

---

[5] Hunter stated: "Drummond was trying to sit up and put pressure on [the wound,] but the officer had the gun on him and kept telling him to lay back down;" and she stated, "[I]t looked like [Drummond] was trying to grab his leg to stop some of the bleeding, but from -- the officer kept telling him lay back down[,] and it looked like he couldn't pull his leg up to stop it so he was trying to sit up to stop it." Hunter also stated that Drummond's hands remained on the wound throughout the entire incident—the "30 minutes" or "45 minutes" she claimed it took the paramedics to arrive.

489 U.S. at 201. A state is not subject to liability under *DeShaney*'s state-created danger exception unless it takes an "*affirmative* action that exposed decedent to [a] danger to which [he] was not already exposed." *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995). The officers actions "neither increased decedent's risk of harm nor rendered [him] more vulnerable." *Id.* The officers did not exacerbate Drummond's injury by guarding him with guns drawn.

C

Third, Pierce contends that the Township violated Drummond's liberty when the officers prevented a private rescue. Specifically, Pierce points to the attempts by Jason Drummond and Lewis to approach Drummond, perhaps to apply pressure to his wound.[6]

Pierce's legal claim to a right to private rescue rests on our unpublished decision in *Beck v. Haik* (*Beck I*), 234 F.3d 1267, 2000 WL 1597942 (6th Cir. 2000) (unpublished). There, county officials forbade a private dive team from entering a river to attempt a rescue of a man who had jumped or fallen from a bridge into the river. *Id.* at \*1–2. We recognized that "official action preventing rescue attempts by a volunteer civilian diver can be arbitrary in a constitutional sense if a state-sponsored alternative is not available when it counts." *Id.* at \*4.

*Beck I*—which does not constitute binding precedent in this circuit—also recognized that "public safety officials should have broad authority to decide when civilian participation in

---

[6] There is no evidence in the record that Jason Drummond would have applied pressure to Drummond's wound. He simply stated that he was unable to approach his nephew. It is also unclear whether Lewis's statement in her deposition that she would have applied pressure to the wound expresses her intent at the time of the incident or merely what she would have done in hindsight. Lewis stated: "I probably would have put pressure on where the bleeding was. . . . I would have put pressure on it. . . . I could have used [a head rack] for a tourniquet. . . . I could have did something to stop that bleeding . . . I would have did anything to help him." We interpret this statement in the light most favorable to Pierce—i.e., that Lewis's subjective intent, at the time of the incident, albeit not expressed to the officers, was to render aid.

rescue efforts is unwarranted." *Id.* "If police officials are not satisfied that would-be rescuers are equipped to make a viable rescue attempt, . . . it would certainly be permissible to forbid such an attempt." *Id.* Even construing the facts in the light most favorable to Pierce, it is undisputed that neither Lewis nor Jason Drummond informed the officers of any ability on their part to render medical aid. And, far from the case in *Beck I*, the officers had no reason to believe Lewis and Drummond could provide aid. Powers and Downs, like the defendant police officers in *Tanner v. County of Lenawee*, were not "aware of the would-be rescuer's qualifications," if any. *Tanner v. Cnty. of Lenawee*, 452 F.3d 472, 481 (6th Cir. 2006). To the extent the Due Process Clause encompasses a right to private rescue, the officers did not violate that right in this case.

### III

Cordell Drummond's untimely death is unquestionably tragic. But § 1983 "applies only if there is a deprivation of a constitutional right." *Bowers*, 686 F.2d at 618. In other words:

> There is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law. But there is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment or, we suppose, any other provision of the Constitution.

*Id.* (internal citations omitted) (Posner, J.). We sympathize with Drummond's relatives, but we agree with the district court's cogent analysis that the Township did not deprive Drummond of a constitutional right.[7] In this case, construing the facts in the light most favorable to Pierce, Springfield Township did not violate Drummond's rights under the Due Process Clause.

---

[7] Although it is not necessary to reach the issue, we also agree with the district court's lucid reasoning that the defendants would, in any event, receive qualified immunity. *See Pierce v. Springfield Township*, No. 1:11-cv-847, slip op. at 24–28 (S.D. Ohio May 21, 2013).

12

Because Pierce fails to state a claim under § 1983, we agree with the district court's reasoning and AFFIRM its judgment.

**MERRITT, Circuit Judge, concurring.** I agree with the court's result but not all of its reasoning. The court's idea that there is no "general duty" on the part of the government "to protect its citizens" and that all rights should be viewed as "strict negative rights" suggests a strict libertarian ideology that does not reflect the way our system works. *See* David P. Currie "*Positive and Negative Constitutional Rights*," 53 U. Chi. L. Rev. 864 (1986). It seems to lead the court to the conclusion that there was no "custody" here, a conclusion with which I disagree.

In this case policemen were thrust into a dangerous situation. They acted by immediately calling for and obtaining an ambulance and maintaining the status quo for the short period that it took for the ambulance to arrive. In maintaining the status quo they took Drummond into custody. With guns drawn, they issued orders to him and others who were present. They were properly cautious in a situation in which Drummond had been firing a pistol wildly.

I think it is better to conceptualize the case as one in which the police had custody and a duty to act without "deliberate indifference" to Drummond's medical needs. The standard of "deliberate indifference" is explained in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In light of the caution the situation required and the obvious medical attention needed, the police acted without "deliberate indifference" in calling for an ambulance which came immediately. Given the specific facts of this case, I cannot see how the police could be at fault in their conduct in briefly maintaining the status quo while the ambulance was on its way.