NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0622n.06

No. 13-2360

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 13, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHRISTINE WARREN, as personal representative for the Estate of Carnell Warren, deceased, | ) ) ) ) | |
| Plaintiff - Appellant, | ) ) | |
| v. | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| PRISON HEALTH SERVICES, INC., dba Prisoners Health Services, Inc.; JEFFREY W. BOMBER; ADAM EDELMAN; GARY RICHARD FREYTAG; LISA ANN SHILLING; CATHY MARIE POPE; and DAVID JOSEPH KIHM; jointly and severally, | ) ) ) ) ) ) ) ) | |
| Defendants - Appellees. | ) | |

Before: BOGGS, COLE, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge. Carnell Warren, an inmate at Michigan's Newberry Correctional Facility, died of a heart attack on January 31, 2010. This case concerns the medical treatment he received from prison officials in the weeks prior to his death. Christine Warren, as administratrix of her husband's estate, sued various prison officials under 42 U.S.C. § 1983, alleging that they violated Carnell's Warren's right, secured by the Eighth Amendment, that prison officials not act with deliberate indifference to his medical needs. The district court granted summary judgment for all the prison officials. Because a jury could reasonably conclude that certain prison officials were deliberately indifferent to Warren's need for immediate cardiac

1

care, we affirm as to defendants Freytag, Edelman, Kihm, and Pope and reverse as to defendants Shilling and Bomber.

I

A

In January 2010, Carnell Warren was an inmate at Newberry Correctional Facility, a state prison in Michigan's upper peninsula.[1]  On January 16, 2010, Lisa Shilling, a prison nurse, learned that Warren complained that his chest was hurting.  According to Shilling's notes, Warren complained that "his chest hurt very bad."  He stated that "he feels like he is about to have a heart attack, can he please see the doctor."  Shilling called Warren, and Warren denied experiencing chest pain or pressure at that time.  Warren informed Shilling that he experienced pain while walking and that he would also become short of breath.[2]  Shilling advised Warren to request an evaluation if the pain reoccurred.  Shilling noted that Warren perceived his medical need to be "urgent" but that Shilling perceived it to be "routine."  Shilling scheduled Warren for a medical exam two days later, January 18.

On January 17, 2010, Gary Freytag, another prison nurse, learned that Warren again complained that he kept experiencing chest pain while walking.  Warren told Freytag that the pain subsided when he sat down and rested.  According to Freytag's notes, Warren stated: "I really want to see the Dr not you.  I'll wait for the Dr."  Freytag noted that Warren declined an assessment by Freytag who then scheduled Warren to see a doctor on January 19.  Freytag also instructed Warren to contact the health unit if his symptoms worsened or persisted.

---

[1] These facts come from the parties' depositions and from Newberry medical records.
[2] Shilling's notes state that Warren "becomes SOB."  "SOB" refers to shortness of breath. Dorland's Illustrated Medical Dictionary 1729 (32d ed. 2012).

On January 18, Dr. Jeffrey Bomber evaluated Warren. Bomber noted that Warren complained of "chest pain." Warren told Bomber that he had "never had chest pain like this before." Bomber noted that Warren experienced "mid[-]chest pain that is associated with exertion," "relieved by rest," and "associated with sweating and shortness of breath." Warren denied experiencing pain radiation into his left arm or jaw. Warren's diagnosis was: "Chest pain, symptoms consistent with true Angina." Bomber stated in his deposition that this meant that he, in fact, believed that Warren was experiencing chest pain. Bomber requested that Warren receive a "Cardiolite Cardiac Stress Test." Bomber explained that this test is one "where the patient exercises on a treadmill, or it can be given Persantine, which stresses the heart and you can by laying [sic] down for that."[3] "Cardiolite" refers to "a nuclear portion [sic] that's injected, and then a nuclear camera is used to take pictures during the process." According to Bomber, Cardiolite is a radioactive material that is injected into the vein of the patient. The test that Bomber requested was one that required a cardiologist to perform. Additionally, on January 19, Bomber also placed an order for Warren to receive an electrocardiogram.

In conjunction with Bomber's evaluation, Bomber submitted a consultation request for Warren to receive the "Cardiolite cardiac stress test by cardiologist or other certified physician." Bomber indicated that his presumed diagnosis was atherosclerotic heart disease. Bomber asked the consultant to determine: "Is the patient's chest pain from ASHD[4]?" Bomber indicated that Warren had experienced "intermittent chest pain over the past week," that Warren described the pain as "mid sternal and severe," and that Warren reported that the pain was "associated with feeling hot and sweaty." Bomber further indicated that Warren was obese, had diabetes, and was

---

[3] Bomber explained that Persantine is a medication injected into a patient to stress the heart, in lieu of having a patient exercise on a treadmill.

[4] "ASHD" refers to arteriosclerotic heart disease. Dorland's Illustrated Medical Dictionary 1729 (32d ed. 2012).

3

taking Glucophage. Bomber reported that Warren "needs stress testing" and requested that the consultation be performed within one week.

On January 20, 2010, Warren received the electrocardiogram that Bomber had ordered. At his deposition, Bomber stated that he recalled receiving the results and that they were "essentially normal."[5]

Dr. Adam Edelman, another physician, reviewed Dr. Bomber's request for a Cardiolite cardiac stress test. On January 21, 2010, Edelman responded to Bomber that he "would only do this type of stress test [i.e., a Cardiolite cardiac stress test] under very limited circumstances." He requested that Bomber submit a new consultation request "for a standard stress test if patient can exercise, or a dobutamine stress echo if he cannot." Bomber discussed Edelman's response with Dr. Squire, a third physician. According to Bomber, Squire felt that a treadmill cardiac stress test would provide the same information as a Cardiolate cardiac stress test.

Around this time, Warren telephoned his wife to inform her that he was experiencing chest pains. Warren told Ms. Warren that the prison health unit said it would take him to the hospital. The following day, Warren again telephoned his wife and reported that the health unit still had not taken him to the hospital. He told Ms. Warren that he was continuing to experience chest pain and shortness of breath when walking. Ms. Warren stated in her deposition that her husband said the health unit "kep[t] telling him they're going to take him to the hospital but they never take him." One week later, on January 27, 2010, Warren again telephoned his wife. Warren told his wife that the health unit still had not taken him to the hospital and "that he just have to wait till they call him out and then then they'll take him."

---

[5] Bomber stated that there appeared to be "an artifact on V5, a small artifact there, but otherwise it's a normal sinus rhythm." Bomber used "artifact" to refer to a result that did not appear normal but which had no medical significance.

4

That same day, Ms. Warren called the prison and spoke with David Kihm, the health unit manager. Ms. Warren told Kihm that her husband was experiencing chest pains and inquired about the status of her husband's hospital visit. Kihm told Ms. Warren that the prison was "waiting on some tests and documentation . . . to be approved for his test." Kihm told Ms. Warren that he would look into the matter but that protocol needed to be followed. Kihm and Ms. Warren agreed that Kihm would call back in a few hours with an update.

After speaking with Ms. Warren, Kihm contacted Bomber about Warren's cardiac stress test. Later that day, January 27, Bomber e-mailed Kihm to state that Squire had given verbal approval for a "cardiac stress test (standard)." Bomber instructed Kihm to resubmit the consultation request, to mark it "urgent," and to indicate that Squire had pre-approved the request." Bomber wrote that the test could be "done here at 3 p.m. today or next Tuesday" on February 2. Kihm, in his deposition, stated that he understood that "there was some urgency" to get the test done and that he "want[ed] to see the man taken care of, sooner than later." Kihm stated that he was concerned that Warren was not receiving a stress test. In his deposition, Bomber explained that it was Dr. Squire who directed that the request for the stress test be marked urgent and that this was done "so it would be done that day and so it wouldn't get missed and be done that day."

Kihm "feverishly worked" to schedule Warren for a stress test that day. Specifically, Kihm prepared the security paperwork to authorize the prison to transport Warren to the hospital. Bomber personally called the hospital to try to schedule the stress test for that day. At first, Bomber was able to schedule Warren for a test that day to be performed by Dr. Magyar. Then, however, Bomber spoke with Dr. Magyar's nurse and learned that Magyar could not perform the test that day. Bomber also spoke directly with Dr. Rao, who told Bomber that he could not

5

conduct the test that day but that he would do it first thing Tuesday morning—six days later. Bomber then called Kihm to report that it was not possible to schedule the test for that day because no physician was available to monitor the stress test. Kihm, the health unit manager, felt it was "very important" that Warren receive the stress test that day. Unable to schedule the test for that day, Bomber and Kihm scheduled it for February 2, six days later.

Kihm called Ms. Warren back that day and told her that her husband's test was now scheduled "and that everything was going to be fine and that they were just going to have to wait for the guards to go get him and to take him to the hospital." Subsequently, Ms. Warren spoke with her husband again. Ms. Warren told her husband that Kihm said that the stress test was scheduled and "that the only thing that they were waiting for was for the guards to come get him and take him to the hospital."

The following day, on January 28, 2010, Cathy Pope, another prison nurse, examined Warren. She noted that Warren now complained of "heavy pressure in chest," "weakness," "dizziness," 'wheezing/shortness of breath," and "nausea." She further noted that Warren's pain was preceded by activity or anxiety and was relieved by rest. Warren had been experiencing pain for one hour prior to Pope's evaluation. Warren told Pope that he was walking to the dining hall when the pain began and that the pain was too severe for him to eat. Pope noted that Warren's pain was a nine (presumably, out of ten) on the "pain scale." She also noted that Warren had been experiencing these symptoms for one month and that the symptoms were ongoing. Pope placed Warren on nitroglycerin, among other medications, and she scheduled Warren to see a doctor that day or the following day.

The next day, on January 29, 2010, Warren woke up with severe chest pains. He saw Shilling, the nurse with whom he had originally spoken about his symptoms two weeks prior.

6

Warren informed Shilling that he "woke up with this sharp, tightness, achiness in the center of my chest 10 minutes ago." He reported that he was not experiencing pain at the time of his evaluation. He told Shilling that he knew he was supposed to have a stress test. Warren also reported that he had not yet started taking the nitroglycerin that he had been given. Warren also reported: "For one month now every time I walk to school from my unit I get this pain in the center of my chest[,] and I get short of breath or if I walk to the big yard[,] the pain comes." Shilling also noted that Warren refused his prescribed insulin. Shilling noted that she "educated" Warren "on consequences of uncontrolled diabetes and the effects on the body" but that Warren "still refuses prescribed insulin." She scheduled Warren to see a doctor about the "insulin refusals and intermittent chest tightness."

That same day, on January 29, Ms. Warren spoke again with Kihm about her husband's stress test. Kihm called Ms. Warren to ask that she speak with her husband about taking a shot for diabetes. Ms. Warren inquired about whether her husband had ever been taken for a stress test, and Kihm did not answer.

Also on January 29, 2010, Dr. Bomber again evaluated Warren for a second time. At his deposition, Dr. Bomber was asked about Warren's symptoms up until this time. Dr. Bomber believed, at the time of his deposition, that Warren was experiencing "stable angina" because his chest pain subsided with rest, which is consistent with stable angina. Bomber stated at his deposition that a "patient with stable angina is very unlikely to die." Bomber felt that, as a matter of statistics, it was "very unlikely" that Warren would experience a heart attack. According to Bomber, the "overwhelming data . . . is that stable angina can be treated and is unlikely to kill you versus unstable angina." Bomber stated, however, that the symptoms that Warren reported to Pope on January 28 might constitute "worsening symptoms" and might

7

indicate that a patient with Warren's symptoms was "getting worse." Bomber agreed at his deposition that the fact that Warren told Shilling on January 29 that he was experiencing chest pain *without exertion* was a "more ominous sign" than chest pain only with exertion. Bomber stated that, based on Shilling's January 29 notes, Warren may have had "unstable angina." Bomber further stated that a patient with unstable angina reporting current chest pain should be sent immediately to the emergency room. Bomber further stated that a patient with unstable angina should receive oxygen and possibly other medications while preparing to go to the hospital.

During Warren's January 29 examination, Dr. Bomber personally observed Warren's symptoms. Warren's pulse was 105. At his deposition, Bomber agreed that this was a tachycardia, a condition in which the heart beats faster than normal. Warren's blood pressure was 143/100. Bomber agreed that Warren, at the time of his evaluation, had an elevated pulse and an elevated blood pressure. Bomber's notes state: "Nitro helps." By this, Bomber meant that Warren reported that nitroglycerin helped his chest pain. Bomber ordered that Warren be allowed a nutritious "snack bag," that he see a dietician, that he begin taking Glyburide, that he begin taking Vasotec "to reduce the load on the heart and also [to] decrease blood pressure," that the health unit discontinue finger-stick blood checks for Warren, and that the health unit check Warren's blood pressure two times a week for two weeks. Bomber ordered that Warren discontinue the finger-stick blood tests because Warren was not complying with most of the orders to have them done. Bomber's notes indicate that Warren refused insulin and that Bomber discussed "diabetes, insulin, etc." with Warren. Bomber's notes also state: "keep appt for stress test." Bomber stated at his deposition that at the time he evaluated Warren on January 29, he had

8

not seen Shilling's notes from earlier that day suggesting that Warren may have had unstable angina.

Two days later, on January 31, 2010, Warren died of a heart attack.

B

Ms. Warren entered into the record several documents purporting to explain policies of the Michigan Department of Corrections. One document, titled "Emergent & Urgent Health Care," divides various health-care conditions into three categories—emergent, urgent, or non-emergent—in order to identify which conditions present "an emergency and which ones can be briefly delayed." According to the document, the most serious conditions are "emergent," conditions that "are life-threatening illnesses or injuries." The document states that prison officials, in response to these conditions, should "[s]tart lifesaving measures, if indicated, and make sure prisoner is seen by Health Care immediately." The document lists "[c]hest pain" as an emergent condition. Another document, titled "Michigan Department of Corrections: Policy Directive," defines "emergent" as a "condition for which delay in treatment may result in death or permanent impairment."

C

On July 16, 2012, Ms. Warren, as administratix of her husband's estate, filed a second amended complaint against various prison officials, asserting various federal and state claims. Ms. Warren named Bomber and Edelman, along with their employer, Prison Health Services, Inc. ("PHS"), as defendants.[6] Ms. Warren also named the following nurses as defendants:

---

[6] The district court presumed that all defendants were state actors. See *Warren v. Prison Health Servs., Inc.*, No. 2:12-CV-13, 2013 WL 4829959, at *3 n.2 (W.D. Mich. Oct. 16, 2012). We do the same.

9

Freytag, Shilling, Pope, Donna Quinlan, James Carne, and Kihm. She also named warden Mitch Perry as a defendant.

On October 16, 2012, the district court dismissed Ms. Warren's state-law negligence claim because the facts alleged gave rise to a medical-malpractice claim, superseding the negligence claim. *See Warren v. Prison Health Servs., Inc.*, No. 2:12-CV-13, 2012 WL 4923812 (W.D. Mich. Oct. 16, 2012). On June 17, 2013, the district court, pursuant to a joint stipulation, dismissed the case against nurses Carne and Quinlan and against warden Perry.

Ms. Warren's federal claim, arising under § 1983, alleged that the prison officials demonstrated a "reckless disregard" to Warren's serious medical needs, in violation of the Eighth Amendment. Ms. Warren also claimed that, pursuant to *Monell v. Department of Social Services of New York City*, 436 U.S 658 (1978), Prison Health Services maintained unconstitutional practices and policies. Ms. Warren also alleged that the prison officials committed medical malpractice in violation of state law.

On September 10, 2013, the district court granted summary for the prison officials on the federal claims and dismissed the medical-malpractice claim without prejudice. *See Warren v. Prison Health Servs., Inc.*, No. 2:12-CV-13, 2013 WL 4829959, at *11 (W.D. Mich. Sept. 19, 2013). We review de novo the district court's grant of summary judgment.[7] *Pierce v. Springfield Twp., Ohio*, 562 F. App'x 431, 435 (6th Cir. 2014).

---

[7] On appeal, Ms. Warren does not argue that the district court erred in declining to exercise jurisdiction over her remaining state-law claims. At any rate, we review a district court's decision not to exercise supplemental jurisdiction over a state-law claim for abuse of discretion. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id.* at 952. Here, there is no reason to believe that the district court erred in declining to exercise supplemental jurisdiction over Ms. Warren's state-law claims. *See Scola v. Publix Supermarkets, Inc.* 557 F. App'x 458,

II

A

Section 1983 provides a federal cause of action against state officials for the deprivation of constitutional rights under color of state law. Here, Ms. Warren asserts that the prison officials deprived her husband of his Eighth Amendment rights by acting with deliberate indifference to his medical needs.

"[C]ruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII. This prohibition binds the states. *See Robinson v. California*, 370 U.S. 660, 666 (1962). The Eighth Amendment obligates the states "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The reason is for this is "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Ibid.*

Prison officials violate this prohibition when they act with "deliberate indifference to serious medical needs." *Id.* at 104. Prison doctors may manifest deliberate indifference "in their response to the prisoner's needs." *Ibid.* In *Estelle*, the Court offered four examples of this type of violation: a doctor choosing the "easier and less efficacious treatment;" an official injecting a drug knowing that the prisoner was allegeric to it and a doctor's subsequent refusal to treat the allergic reaction; a paramedic's refusal to provide treatment; and a prison doctor's refusal to follow a surgeon's express postoperative instructions. *Id.* at 104 n.10.

On the other hand, "an inadvertent failure to provide adequate medical care" does not violate the Eighth Amendment. *Id.* at 105. Neither does mere "negligen[ce] in diagnosing or treating a medical condition" nor simple "[m]edical malpractice." *Id.* at 106.

---

472 (6th Cir. 2014) (relevant factors did not weigh in favor of district court exercising jurisdiction over state-law claims).

11

*Estelle*'s deliberate-indifference standard requires inquiry into prison officials' subjective state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991); *see Farmer v. Brennan*, 511 U.S. 825, 838 (1994) ("Eighth Amendment suits against prison officials must satisfy a 'subjective' requirement.").

Since *Estelle*, the Court has also clarified the requisite mens rea for deliberate indifference. Negligence does not satisfy the standard. *Wilson*, 501 U.S. at 305. But deliberate indifference does not require either that prison officials *intend* to cause harm or that they *know* that harm will result. *Farmer*, 511 U.S. at 835; *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Acting with deliberate indifference to a serious medical need is reckless disregard of the risk. *Farmer*, 511 U.S. at 836. In the Eighth Amendment context, prison officials must, *in fact*, know of a risk to inmate health and disregard that risk. *Id.* at 837. In other words, an "official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837. Recklessness, in the Eighth Amendment context, requires that a prison official "consciously disregard a substantial risk of serious harm." *Id.* at 839 (internal quotation and alteration marks omitted).

Although prison officials must, in fact, be aware of a substantial risk of harm, courts "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *accord Gunther v. Castineta*, 561 F. App'x 497, 500 (6th Cir. 2014). Additionally, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

The Supreme Court has applied the deliberate-indifference standard several times. In *Estelle*, prison doctors were not liable for failing to order "an X-ray or additional diagnostic

12

techniques," for this "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. In another case, both parties agreed that the allegations stated an *Estelle* violation where the plaintiff claimed that the prison facility was grossly inadequate to treat the inmate's chronic asthma, that the prison kept the inmate in the facility despite doctors' advice, and that prison officials delayed medical attention for eight hours after the inmate suffered an asthma attack. *Carlson v. Green*, 446 U.S. 14, 16 n.1, 17 n.3 (1980).

B

A few preliminary remarks are in order.

First, the district court granted summary for the defendants based solely on the *Estelle* standard's subjective requirement.[8] *See Warren*, 2013 WL 4829959, at *5, *7. On appeal, Dr. Bomber, Dr. Edelman, and PHS do not argue that Warren's medical needs were not objectively serious. See Doctor Br. 8–9, 10–18. Nurses Freytag, Shilling, Pope, and Kihm concede, for purposes of their summary-judgment motion, that Warren's medical need was objectively serious. Nurse Br. 14. Similarly, we presume without deciding that Warren satisfies the *Estelle* standard's objective requirement.

Second, defendant Prison Health Services—oddly—asserts that Ms. Warren does not dispute the dismissal of her claim against it. *See* Doctor Br. 2. Ms. Warren's notice of appeal states that she appeals "from the Judgment and Order dated September 10, 2013." The district court's order dated September 10, 2013, granted summary judgment for PHS on Ms. Warren's federal claims. There is nothing to indicate that Ms. Warren's notice of appeal is insufficient to appeal the district court's grant of summary judgment for PHS. PHS is a named party on appeal, and counsel for Bomber and Edelman filed an appearance on behalf of PHS. Additionally, Ms.

---

[8] We use "*Estelle* standard" to refer to the deliberate-indifference standard that the Court developed both in *Estelle* and its progeny.

13

Warren lists PHS as a current defendant at this stage in the litigation. *See* Appellant Br. 10. Nonetheless, on appeal, Ms. Warren declined to brief whether granting summary judgment was improper as to PHS. (And counsel for PHS have failed to file a brief on behalf of PHS.) Consequently, we consider the issue abandoned.

C

There are literally hundreds of cases in which inmates have challenged the adequacy of their medical care. Nonetheless, because Ms. Warren relies heavily on two of our precedents, we review them at length at the outset.

1

*Estate of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005), involved a police officer's alleged deliberate indifference to a pretrial detainee's obvious heart-attack symptoms. There, a detainee repeatedly complained to an officer over a four-hour period about chest pains and shortness of breath, what we called "some of the classic symptoms of a heart attack." *Id.* at 307–08. The detainee informed the officer that she needed to go to a hospital and that she was three days behind on heart medication.[9] *Id.* at 307. The detainee repeatedly cried loudly for help. *Ibid.* The officer neither transported the detainee to the hospital nor informed his relief about the detainee's condition. *Id.* at 307–08. After several hours of complaining about chest pains, officials found the detainee unconscious of the floor of her cell, and she was shortly thereafter pronounced dead of a heart attack. *Id.* at 308.

In a published opinion, we first found that the plaintiff satisfied the *Estelle* standard's objective requirement. *See id.* at 311–12. We held: "[E]ven laypersons can be expected to know

---

[9] After the detainee's death, this proved to be false, but what was relevant for the court was what the officer believed at the time of the detainee's medical needs. *See Estate of Carter*, 408 F.3d at 307.

14

that a person showing the warning signs of a heart attack needs treatment immediately in order to avoid death." *Id.* at 312. We then found that the record contained sufficient evidence for the plaintiff to satisfy the subjective requirement. *See id.* at 312–13. In an important passage, we held that because "substantial evidence" supported that the officer "did in fact draw the inference that [the detainee] was suffering from a serious medical problem," the plaintiff thus did not need to present "explicit evidence" that the officer drew the inference. *Ibid.* Circumstantial evidence sufficed. *See id.* at 313. "In most cases in which the defendant is alleged to have failed to provide treatment," we said, "there is no testimony about what inferences the defendant in fact drew. Nonetheless, in those cases, a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective requirement." *Ibid.*

2

In *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531 (6th Cir. 2008), a pretrial detainee, over a two-week period, experienced increasingly dire symptoms, including swelling, altered skin color, vomiting, labored breathing, chest pains, nausea, constipation, fatigue, numbness, dizziness, and intermittent unconsciousness. *Id.* at 536–37. During this time, correctional officers, including a doctor, evaluated the detainee and prescribed various medication. Correctional officers eventually found the detainee unconscious on her cell floor, and she was pronounced dead of untreated diabetes. *Ibid.*

Viewing the facts in the light most favorable to the plaintiff, a divided panel held, in another published opinion, that the evidence was sufficient to conclude that the correctional officers were aware of the detainee's complaints about shortness of breath and chest pains. *Id.* at 541. The panel "f[ou]nd persuasive the correctional officers' disregard of prison protocols,"

15

which required officers to transport inmates to a hospital in response to complaints of chest pain. *Id.*

## III

We must address the subjective component of an *Estelle* claim individually for each defendant. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). We first discuss the conduct of the defendants less involved with Warren's medical care and proceed to discuss those defendants most familiar with Warren's condition.

### A. Nurse Freytag

On January 17, 2010, Freytag received a phone call from a correctional officer about Warren complaining of chest pain. Freytag spoke with Warren over the phone, and Warren reported chest pain and requested to come to healthcare. Freytag instructed the officer to send Warren to healthcare. Warren arrived and asked to see a doctor. Freytag stated that a doctor was not available because it was a Sunday. Warren told Freytag that he had chest pain that was getting worse and that it was an ongoing problem. Freytag repeatedly offered to evaluate Warren, but Warren declined. Freytag told Warren that if his symptoms persisted, Warren definitely needed to return to healthcare. Warren appeared "well" and "healthy" to Freytag, and "his color was pink." Warren was not clutching his chest, and he did not appear to be in distress. Freytag stated in his deposition that because of the proximity of Warren's cell to healthcare, he did not have time to review Warren's file before Warren arrived at healthcare. Consequently, he was not aware that Warren had seen Shilling the prior day. Shilling had previously scheduled Warren to see a doctor for January 18. Freytag states that he scheduled Warren to see a doctor for January 19. He also states that he would not have scheduled Warren for the 19th if he had

16

known that Warren was already scheduled for the 18th. (Warren, in fact, saw Dr. Bomber on January 18).

On another occasion, Freytag conducted an electrocardiogram for Warren. Warren appeared "fine that day." Although Freytag is not authorized to interpret electrocardiograms, Warren's electrocardiogram appeared normal and "perfect" to Freytag.

This is insufficient evidence for a reasonable juror to conclude that Freytag, in fact, "dr[e]w the inference" that "a substantial risk of serious harm exist[ed]." *Farmer*, 511 U.S. at 837. The information Freytag knew was also probably insufficient even to allow him to draw the inference. *See ibid.* The mere act of reporting ongoing chest pain, under these circumstances, is insufficient. Despite Warren's refusal of an evaluation, Freytag observed Warren's physical condition and noted that he appeared well.

## B. Dr. Edelman

In January 2010, Edelman served as the medical director for utilization management at Prison Health Services. In this capacity, Edelman was in charge of managing financial resources in connection with patient care. His job entailed reviewing consultation requests for offsite services.[10]

Edelman reviewed Dr. Bomber's January 18, 2010, consultation request for a Cardiolite cardiac stress test. On January 21, 2010, Edelman responded to Bomber's request in writing: "We would only do this type of stress test under very limited circumstances." Edelman advised Bomber to submit a new request "for a standard stress test if patient can exercise, or a

---

[10] Edelman stated in his deposition that there were a sufficient number of these requests from all state prisons in Michigan to provide full-time work for two physicians—at the time, himself and Dr. Squire.

Dobutamine stress echo if he cannot." At his deposition, Edelman did not recall reviewing the consultation request for Warren, and he did not recall ever having a conversation about Warren.

Edelman did not evaluate or observe Warren. The information submitted to him by Bomber is insufficient to conclude that Edelman "kn[ew] that [Warren] face[d] a substantial serious risk of serious harm." *Farmer*, 511 U.S. at 847.

## C. Nurse Kihm

Kihm served as the health-unit manager at the prison. Kihm stated in his deposition that this was primarily an "administrative position" and that he was not directly involved with patient care. His responsibilities included overseeing nurse scheduling, overseeing paperwork, and transmitting health statistics to the state.

Kihm corresponded with both Ms. Warren and Dr. Bomber about Warren's stress test. On January 27, Kihm received an e-mail from Dr. Bomber stating that Dr. Squire, the other doctor responsible for utilization management at PHS, "gave verbal approval for a cardiac stress test (standard)" and that Kihm should resubmit a consultation request as "urgent." Kihm prepared the necessary security paperwork to have Warren transported to the hospital.

On January 28, 2010, Kihm happened to see Nurse Pope evaluating Warren while Kihm was walking through the clinic. Pope told Kihm that Warren experienced chest pain while walking but that he was not currently experiencing any pain. Kihm observed that Warren appeared "fairly comfortable" and not "short of breath or in acute distress or anything." Kihm stated in his deposition that "there was nothing that day to impress me . . . that [Warren] was in dire straits at that time."

Under these circumstances, there is insufficient evidence to conclude that Kihm "actually understood that [Warren] was subject to a substantial risk of serious harm." *Estate of Carter*,

408 F.3d at 312. It is true that Kihm stated in his deposition that "chest pain is obviously a life-threatening condition until evaluated . . . until you know where you're going with it." But the evidence cannot support the conclusion that Kihm knew—or even should have known—of Warren's serious medical needs. What Kihm *did know* was that Warren was receiving a medical evaluation by healthcare staff.

### D. Nurse Pope

Pope evaluated Warren on January 28, 2010. According to Pope's medical notes, Warren complained of "heavy pressure in chest," "weakness," "dizziness," "wheezing/shortness of breath," and "nausea." Warren complained that his pain was "preceded by activity or anxiety" and "relieved by rest." He reported that he experienced these symptoms for a month, and he described his pain as a nine (presumably, out of ten) on the "pain scale." Warren told Pope that the pain "was so bad [that] be could not eat." In her deposition, Pope stated that Warren denied experiencing any pain at the time of the evaluation and that she observed no distress or shortness of breath.

Pope presents a closer case than the defendants discussed above. Even assuming that Warren's reported symptoms, along with the prison policy listing "chain pain" as an emergent condition—one "for which delay in treatment may result in death"—constituted sufficient circumstantial evidence to conclude that Pope knew of Warren's serious medical needs, there is insufficient evidence that Pope "disregarded the substantial risk of serious harm" to Warren. *See Estate of Carter*, 408 F.3d at 313. Immediately after seeing Warren, Pope called Dr. Burtch, the on-call physician, and notified him of Warren's symptoms, condition, and vital signs. Burtch

19

ordered Pope to administer to Warren one unit of nitroglycerin and then to wait five minutes.[11] If Warren continued to experience pain, Pope was instructed to administer additional units. If Warren's pain did not subside after three units, Pope was under orders to send Warren to the emergency room. Burtch told Pope that he would see Warren when he was next in the clinic, but Pope placed Warren on the list to see a doctor the following day. Pope repeatedly asked Warren if he was currently experiencing any pain, and Warren denied pain. *fIb*Under the circumstances, there is no genuine issue as to whether Pope disregarded the substantial risk of serious harm to Warren.

### E. Nurse Shilling

Shilling was more involved in Warren's medical care than the above defendants. On January 16, 2010, Shilling learned that Warren complained of chest pain. Shilling spoke with Warren, and her notes reflect that Warren "state[d] he feels like he is about to have a heart attack, can he please see the doctor." Warren denied currently experiencing pain. Shilling scheduled Warren to see a doctor, and Warren saw Dr. Bomber on January 18.

Shilling evaluated Warren again on January 29. Shilling stated in her deposition that because the computer system was down, she would not have been familiar with Warren's medical history unless Warren had told it to her. Warren reported his symptoms at this time differently than he had done in the past. He told Shilling that he "woke up with this sharp, tightness, achiness in the center of my chest." Although Warren did not experience pain at the moment of the evaluation, he was experiencing chest pain just ten minutes prior.

---

[11] It is unclear whether Warren, in fact, took a dose of nitroglycerin on January 28. Pope's medical notes state: "[patient] *to begin* Nitro," suggesting that Warren did not take the nitroglycerin in front of Pope (emphasis added). On January 29, Warren told Shilling: "They gave me some Nitro to take[,] but I haven't taken any yet."

20

Viewing the facts in the light most favorable to Ms. Warren, a reasonable juror could conclude that Shilling actually knew that Warren had a life-threatening medical need. Shilling knew that Warren experienced acute chest pain in the prior few minutes. She described Warren's pain as "com[ing] and go[ing] throughout the day." Shilling knew that Warren was not taking necessary medication. *See Estate of Carter*, 408 F.3d at 312 (officer believed that detainee "had not taken her heart medication for three days"). Shilling stated in her deposition that she is aware that a patient currently experiencing symptoms of chest pain and shortness of breath "would be emergent." According to the purported prison policies submitted as evidence by Ms. Warren, an emergent condition is "life-threatening" and "may result in death." Although Shilling stated that she considered Warren's condition to be urgent and not emergent on January 29, "a jury would be entitled to discount that explanation." *Id.* at 313. Shilling also stated—in tension with her prior statement in her deposition—that she may have been familiar with Warren's medical history when she saw him on January 29.[12] This evidence, direct and circumstantial—though admittedly susceptible to multiple interpretations—is sufficient to satisfy the subjective requirement. Additionally, there is evidence that Shilling disregarded a substantial risk of harm to Warren by failing to send him to the hospital, as she was authorized to do.

### F. Dr. Bomber

Dr. Bomber also saw Warren twice in the weeks before Warren's death. On January 18, 2010, Bomber evaluated Warren and noted that Warren stated that he had "never had chest pain like this before." Bomber ordered a cardiac stress test, and he requested that it be performed within one week, i.e., by January 25. Bomber asked the consulting cardiologist: "Is the patient's chest pain from ASHD [i.e., arteriosclerotic heart disease]?" By January 27, however, Bomber

---

[12] Shilling said: "Like I said, I may have known more of his history at that time in memory from taking care of him."

21

was aware that the test had not been conducted. He spoke with Dr. Squire, a utilization-management doctor at PHS, about the matter. Squire instructed Bomber to submit a new request for a test and to mark the request "urgent." Bomber called a hospital and attempted to have Warren tested that day. He spoke with Dr. Magyar's nurse, who informed Bomber that Dr. Magyar was unavailable that day. Bomber then spoke directly with Dr. Rao, who agreed to perform the test six days later, on February 2.

Bomber evaluated Warren again on January 29, 2010. Bomber knew at this time that Warren now had an elevated blood pressure and a pulse of 105. Bomber knew that Warren was refusing prescribed medication. Bomber knew that Warren still had not received a stress test. Bomber, at the time of his deposition, stated that the symptoms that Warren reported to Pope on January 28 might be "worsening symptoms," and he also stated that Shilling's medical notes from that morning might indicate unstable angina, a condition that would necessitate an immediate visit to the emergency room. Although Bomber denied seeing Warren's medical history when he evaluated him on January 29, 2010, the fact that Bomber saw Warren on the same day as Shilling and only one day after Pope is sufficient circumstantial evidence for a juror to conclude that Bomber was aware of Warren's recent medical history. Ms. Warren need not offer direct evidence that Bomber saw Pope's and Shilling's notes. *See Estate of Carter*, 408 F.3d at 313. Whether Bomber, in fact, knew Warren's recent medical history when he saw him on January 29 is a triable issue of material fact. In sum, based on a view of the facts most favorable to Ms. Warren, Bomber knew that Warren had a serious, life-threatening medical need. There is also sufficient evidence that Bomber disregarded the risk to Warren by not sending Warren to the hospital and not placing Warren on oxygen and medication, as Bomber would have done for a patient with unstable angina.

22

IV

A

Defendants present several arguments to show that they did not act with deliberate indifference. Bomber, relying on *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834 (6th Cir. 2002), argues that this court applies a "grossly inadequate care" standard when an inmate has received some medical care. Doctor Br. 11. Although *Terrance* did apply a "grossly inadequate care standard," *Terrance*, 286 F.3d at 844–47, it does not stand for the proposition that Bomber advances. In fact, the *Terrance* court viewed its "grossly inadequate care" standard as providing liability for "*less flagrant* conduct" than that covered directly by *Estelle* and its progeny. *Id.* at 843 (emphasis added). In short, *Terrance* did not displace or add any new gloss on the standard developed by the Supreme Court in the *Estelle* line of cases, as counsel acknowledged at oral argument.

Shilling claims that she cannot be liable for an *Estelle* claim unless she had a mens rea of "deliberateness tantamount to an intent to punish." Nurse Br. 15, 18 (quoting *Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993)). That standard is not good law. *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference . . . is satisfied by something less than acts . . . for the very purpose of causing harm.").

Further, Shilling argues that Ms. Warren's allegations amount, at most, to mere medical malpractice, which is not cognizable under § 1983. *See* Nurse Br. 27–28. But we do not expose Shilling and Bomber to liability for simply misdiagnosing a condition or for exercising medical judgment that, in 20/20 hindsight, proved incorrect. The point is that sufficient evidence exists to permit a juror to conclude that Shilling and Bomber *actually knew* of a serious risk of harm and disregarded that risk.

Shilling claims that the only evidence that she and Bomber acted with the requisite recklessness are the prison policies and the deposition testimony of Ms. Warren's expert cardiologist. *See* Nurse Br. 28. But even aside from the direct evidence of mens rea discussed above, Shilling ignores that a fact-finder may infer actual knowledge based both on "circumstantial evidence" and "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. That is, "a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component." *Estate of Carter*, 408 F.3d at 313.

Additionally, Shilling disputes whether the purported policy documents constitute actual policies of the Michigan Department of Corrections. *See* Nurse Br. 29–30. The document titled "Emergent and Urgent Health Care," Shilling says, "is not directed to nursing staff" but is only "a general guide for corrections officers to use when deciding which symptoms need to be prioritized for health care." Nurse Br. 29. This argument, even if true, goes to the weight of the evidence, and Shilling is free to present that argument at trial. For present purposes, we view the record in the light most favorable to Ms. Warren.

Ms. Warren relies, in part, on the expert-witness testimony of a cardiologist. Shilling attempts to diminish this testimony because the expert is not a nurse and is based in Connecticut—not Michigan. *See* Nurse Br. 31. These arguments, too, simply go to the weight of the evidence, an issue beyond our purview. At any rate, we do not rely on the expert testimony because, in analyzing *Estelle* claims, it is relevant neither what prison officials "should [have] known," *Farmer*, 511 U.S. at 837, nor whether their conduct comported with the medical standard of care.[13] What is relevant is what they *actually knew*. *See id.* at 837–38.

---

[13] Under some circumstances, expert testimony might be relevant to show that a prison official actually knew a fact that was widely known in the medical community. *See Quigley v. Thai*, 707 F.3d 675, 682 (6th Cir. 2013).

Lastly, Shilling argues that even if her conduct amounted to a constitutional violation, the right at issue was not clearly established at the time of Warren's death. *See* Nurse Br. 35–40. But an inmate's right to receive medical treatment for a serious medical need was clearly established by 2010.[14] *See Estate of Carter*, 408 F.3d at 313.

B

In permitting Ms. Warren's case to proceed against Shilling and Bomber, we do not conclude that Shilling and Bomber necessarily acted wrongly. But prison officials need not act maliciously to be liable under the *Estelle* standard. What is relevant for now is whether sufficient evidence exists for a reasonable juror to conclude that officials actually knew of and disregarded a serious risk. Under the circumstances here, it would not be unreasonable for a jury to find that Shilling and Bomber meet this standard. The evidence in the record is sufficient for a reasonable juror to conclude that Shilling and Bomber, in fact, knew that Warren had unstable angina on January 29. This issue may be informed by whether they had seen Warren's medical file and by how much they remembered from their prior treatment of Warren. It bears emphasis that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact" for the jury. *Farmer*, 511 U.S. at 842. Our only concern at this point is the sufficiency of the evidence in the record. We offer no judgment as to whether the evidence is sufficient for Ms. Warren to satisfy her burden of proof at trial.

The hundreds of cases involving inmate challenges to medical care provide no bright-line rule about what satisfies the *Estelle* standard's subjective requirement. This case falls into the "very large category" of cases in which we must decide "whether the evidence in the summary

---

[14] Indeed, "[a]s early as 1972, this court stated that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" *Estate of Carter*, 408 F.3d at 313 (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)).

25

judgment record is just enough or not quite enough to support a grant of summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1869 (2014) (Alito, J., concurring in the judgment). Although that is a question on which reasonable jurists might always differ, we conclude that, under these facts, the evidence did not permit granting summary judgment for Shilling and Bomber. Accordingly, we AFFIRM the district-court judgment as to Freytag, Edelman, Kihm, and Pope, and we REVERSE as to Shilling and Bomber and REMAND for further proceedings consistent with this opinion.